## JAMES B. POWER *vs.* A. M. BOWDLE.

Opinion filed January 19th, 1893.

### Action to Determine Adverse Claims—Counterclaim.

In an action under § 5449, Comp. Laws, to determine adverse "estates and interests" in real estate, the defendant may by answer, in addition to a denial of plaintiff's title, allege facts which show title in himself, and ask that such title be quieted and confirmed by the court. Such new matter, when properly pleaded, constitutes a counterclaim, within the meaning of subdivision 1, § 4915, Comp. Laws. Such counterclaim constitutes a cause of action in favor of the defendant, and against the plaintiff, which is "connected with the subject of the action."

### Reply—When Deemed Waived.

To such counterclaim, if not demurred to, the plaintiff must respond by a reply, and, if none is served, the defendant may move for judgment. Comp. Laws, § § 4918, 4919. But where both parties at the trial treat the new matter as traversed and at issue, and evidence upon the same is put in without objection, and the court, without objection, proceeds to litigate and determine the subject matter of the counterclaim, it will be too late, after judgment, to to raise the point that no reply was served. In such case the reply is waived by conduct.

### Estates and Interest—Not Synonymous with Liens.

In said statuory action, "estates and interests" in lands are not synonymous in meaning with "liens." Mere "liens" are not primarily within the purview of the statute; but where a defendant sets out new matter as a counterclaim, which embraces a "lien" upon the land, and asks the court to pass upon the same, and such new matter is heard upon the merits, and is determined by the court, without objection, it will be too late, after judgment, for the defendant to raise the technical objection that "liens" cannot be litigated in such an action.

### Assessment Roll—Sufficiency of Description.

The statute requires parcels of land listed in an assessment roll, which con-consists of parts of sections, to be particularly described. Sections 1544, 1582, Comp. Laws. Accordingly, *held*, that tracts of land in an assessment roll, consisting of parts of sections, described as follows, viz: Name of owner, ———; section ———; town ———; range ———, —followed by a statement of the number of acres, is insufficient, because the part of the section is not particularly described. The fact that such description may not mislead the owner is not alone enough to validate it.

### Insufficient Descriptions.

Following the rule laid down in *Powers* v. *Larabee*, 49 N. W. Rep. 726, 2 N. D. 141, and *Keith* v. *Hayden*, 2 N. W. Rep. 495, 26 Minn. 212, *held*, that the combination of letters and figures given below, and all others of similar

character, in the assessment rolls in question, are insufficient and invalid as descriptions of parts of sections of land, viz: NW4; NW4 of NE4; NE SW; W2 SW. Such symbol writing is not English as it is ordinarily used, and is without the sanction of any general usage among the masses of the people. Hence the symbol writing descriptions cannot be upheld as a basis of taxation, or as a means of building up and perpetuating title to real estate under the revenue laws.

### Judicial Notice of Custom—Usage of Language.

Courts and judges rest under an official obligation to notice and recognize, without proof, such facts and matters as are so notorious as to be generally known. Among other things, courts must judicially notice the vernacular language, and such abbreviations and symbols of ideas as have, from immemorial use, been adopted by the people generally, and thereby have become a part of the common usage of the language. When this occurs, i. e. when a given usage of language ceases to be a mere special usage, limited in its sphere, and emerges into general use among the masses of the people, the state, either by its courts or its legislature, will adopt and legalize such usage, and thereby add the same to the body of the common or of the statute law, as the case may be. Thereafter the existence of such general usage of language is not to be left to the hazards of *nisi prius* trials, to be proved or disproved, as testimony may preponderate one way or the other. Its existence is evidenced by the statute or by judicial precedents, as the case may be.

### Amendment of Answer—New Matter.

The trial court, against objection, allowed defendant to serve an amended answer, embracing among others, the following averments: "That said abbreviations and combinations of letters and figures were in general 'use in Barnes County, North Dakota, and throughout the State of North Dakota, and throughout those parts of the United States where the government system of survey is used for the descriptions of parts of sections of lands, and were generally understood by the people and taxpayers of said Barnes County and the State of North Dakota, and in those portions of the United States where the government system of survey is used." *Held*, that the ruling was prejudicial error.

### Assessor Responsible for Sufficient Description.

In valuing land for taxation, the assessor may refer to descriptions or lists of land furnished either by the county commissioners under § 1544, Comp. Laws, or by individuals under § 1554, Id., but the assessor is officially responsible for the legal sufficiency of the description of all parcels of real estate returned by him. Upon that official alone devolves the entire responsibility of making out and delivering the roll containing a list of taxable lands. Accordingly, *held*, where a parcel of land is attempted to be described in the assessor's return, but such description is inherently and fatally defective, the same cannot be rendered valid and sufficient by showing that it corresponds to a description furnished the assessor by the owner, or by any one else. The public and bidders at tax sales as well as owners, are interested in the descriptions of real estate in tax records and tax titles. Such descriptions, to be sufficient, must point out parcels of land clearly and distinctly by the use of terms commonly understood.

Cross appeals from District Court, Barnes County; *Rose,* J.

Action by James B. Power against A. M. Bowdle, to quiet title, under Comp. Laws, § 5449. From a judgment for defendant, both parties appeal.

Reversed.

*J, E. Robinson* and *C. A. Pollock,* for appellant.

When a custom has become so established as to become a part of the law, the court will act upon it, without requiring it to be proved. *Consegna* v. *Millings,* 1 Peters N. S. C. C. 225. Courts will take judicial notice of whatever is generally known or generally ascertainable within their jurisdictions. *Brown* v. *Piper,* 91 U. S. 37. But parole evidence is not admissable to prove as a custom a local usage changing the significance of the language. *Powers* v. *Larabee,* 49 N. W. Rep. 726, S. C. 2 N. D. 141.

Where land is sold for taxes it is essential that every fact necessary to give jurisdiction should appear on the face of the record. *Thatcher* v. *Powe,* 6 Wheat., 119; *McClung* v. *Ross,* 5 Wheat., 116. Every essential proceeding in the course of a levy of taxes, must appear of record in written and permanent form in the records of the bodies authorized to act upon them. Cooley on Taxation, 247, Desty on Taxation, 1087.

*Newman & Resser,* for respondent.

Defendant pleads title under his tax deed by way of counter-claim. He seeks to defeat plaintiff's title by an equitable cross action. His counterclaim is proper and well pleaded. Pomeroy's Remedies, § 746; *Jarvis* v. *Peck,* 19 Wis. 84.

The fact that the statute makes tax deeds *prima facie* evidence of the regularity of all proceedings and conclusive evidence of the facts recited does not relieve defendant from pleading such proceedings and facts. The statute furnishes a rule of evidence and not of pleading. *Russell* v. *Mann,* 22 Cal. 132; *Himmelman* v. *Danos,* 35 Cal. 441. Parole evidence is admissable for the purpose of applying the description to the land and identifying the land which is described, 1 Greenl. Ev. 286 and 301, n.; *Stewart*

v. *Carter*, 18 N. W. Rep. 98; *Ames* v. *Lowry*, 15 N. W. Rep. 247; *Judd* v. *Anderson*, 1 N. W. Rep. 677; *Knote* v. *Caldwell*, 23 Pac. Rep. 625; Welty on Assessments 170. Descriptions furnished by the United States surveys of the public lands may be used in making assessments. Welty on Assessments 173; *Jenkins* v. *McTigue*, 22 Fed. Rep. 148; *McQuade* v. *Jaffrey*, 50 N. W. Rep. 234; *Taylor* v. *Wright*, 13 N. E. Rep. 529; *Hodgson* v. *Burleigh*, 4 Fed. Rep. 111; *Gilfillan* v. *Hobart*, 24 N. W. Rep. 342; *Judd* v. *Anderson*, 1 N. W. Rep. 678; *Atkinson* v. *Hinman*, 7 Ill. 437. A description by which a competent svrveyor can identify the land is sufficient. *Law* v. *Peo.*, 80 Ill. 268; *Fowler* v. *Peo.*, 93 Ill. 116, *Peo.* v. *Stahl*, 101 Ill. 346.

WALLIN, J. Plaintiff was the owner of lands described in the complaint, and situated in Barnes County. Said lands were sold at tax sale in the years 1887, 1888, and 1889 for the alleged taxes of 1886, 1887, and 1888. Defendant was the purchaser of the lands at each and all of said sales, and tax certificates evidencing the sales, respectively, were delivered to him in due form. No redemption from either of the sales was ever made. The time for redemption from the first sale (1887) having expired, the county treasurer of said county made out in due form, and delivered to defendant, tax deeds of said lands, based on said tax sale of 1887. This action is brought to quiet title under § 5449, Comp. Laws. Defendant by his amended answer denies plaintiff's ownership of the land, and by way of counterclaim alleges title in himself by virtue of said tax deeds, and also sets up the sales to him of said lands for the taxes of 1887 and 1888, as already stated. Defendant demanded as his relief that the title of the lands be quieted and confirmed in himself, and further demanded that, in the event of the sale being declard void, plaintiff be required to pay all of said taxes with interest, as a condition of plaintiff's relief.

In view of the conclusion at which we have arrived, it will be unnecessary to consider all of the many points arising upon the record. We will, however, consider certain points of practice which are incidentally involved, and which effect the judgment

that must be entered below. No reply to the answer was served, nor did defendant move for judgment as for want of a reply. The trial was manifestly conducted upon the theory that all the allegations of the answer which were pleaded as a counterclaim were at issue. Testimony was offered, without objection, to prove and disprove the averments of the answer, and the court, without objection or protest, made its findings of facts and conclusions of law upon the subject-matter of the counterclaim. In this court the claim is made by defendant's counsel that, inasmuch as plaintiff did not reply to the counterclaim, he admitted all the facts stated therein; citing § § 4919, 4933, Comp. Laws. Counsel say: "The question to be determined on the appeal then is, do the facts stated in the defendant's counterclaim entitle him to the relief demanded?" We think the new matter pleaded in the answer constitutes a counterclaim, within the meaning of subdivision 1, § 4915, Comp. Laws. The new matter constitutes a cause of action in defendant's favor and against the plaintiff, and such new matter is "connected with the subject of the action." Bliss, Code Pl. § 374; *Jarvis* v. *Peck*, 19 Wis. 74; *Eastman* v. *Linn*, 20 Minn. 433, Gil. 387, and cases cited. A reply was requisite under the statute, but a reply may be waived, and we are of the opinion defendant waived a reply by proceeding at the trial to treat the new matter in the answer as being traversed and at issue without a reply. Bliss, Code Pl. § 397; *Netcott* v. *Porter*, 19 Kan. 131; *Matthews* v. *Torinus*, 22 Minn. 132.

Another point raised in this court, but which does not appear to have been suggested below, is this: Counsel for defendant claim that "all considerations as to the 1887 and 1888 taxes are eliminated." The position taken is that, the action being brought under § 5449, Comp. Laws, the court can determine only adverse "estates and interests" and that a mere "lien," such as is evidenced by the tax certificates, cannot be litigated. Defendant cites *Bidwell* v. *Webb*, 10 Minn. 59, Gil. 41, which sustains the point, and holds under a statute which, when the case was decided, was similiar to ours, that "liens cannot be determined in such an

action." But in later cases it has been held in Minnesota that where a defendant elects to have his own case determined in such action, and sets out the facts of his case and asks judgment upon such facts, and the court without objection, pronounces judgment thereon upon the merits, it will then be too late for the defendant to raise any technical objection based upon the form of the action. *Hooper* v. *Henry*, 31 Minn. 264, 17 N. W. Rep.·476; *Mitchell* v. *McFarland*, 47 Minn. 535, 50 N. W. Rep. 610. The reasoning of these later cases is, in our judgment, unassailable, and we therefore rule that all questions arising out of the tax sales and certificates of 1888 and 1889 were properly before the trial court, and are therefor before this court for review.

After a trial before the court, numerous findings of law and fact were filed. It was admitted at the trial, and the court found, that the assessment roll of Barnes County, as returned in each of the years, was in the "words, letters, figures, and form" as follows:

ASSESSOR'S BOOK.  EXHIBIT "A."

Return of Land Property in Barnes County, Dakota, Assessed for the Year 1886.

| Owner's Name | Part of Section | Sec. | Twp. | Rng. | Acres | | Acres Ex'mpt | | Assessed Valuation | | Equalized Valuation | | No. of School Dist. | No. of Road Dist. | Remarks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Acres | 100ths | Acres | 100ths | Dols. | Cts. | Dols. | Cts. | | | |
| James B. Power | $E^2$ $NW^4$ | 25 | 141 | 59 | 80 | — | — | — | 350 | — | 280 | — | 7 | — | — |
| James B. Power | $NW^4$, $NW^4$ of $NE^4$, NE SW, $W^2$ SW | 3 | 142 | 58 | 337 | — | — | — | 1200 | , | 1010 | — | 39 | — | — |
| James B. Power | $NE^4$, $E^2$ $SW^4$, $W^2$ $SE^4$ | 9 | 142 | 58 | 320 | — | — | — | 1000 | — | 960 | — | 17 | — | — |
| James B. Power | $NE^4$, $E^2$ of SE | 21 | 142 | 58 | 240 | — | — | — | 900 | — | 720 | — | 17 | — | — |
| James B. Power | $NW^4$ $NE^4$, $E^2$ $NW^4$, SW $NW^4$ | 35 | 143 | 58 | 160 | — | — | — | 600 | — | 480 | — | 39 | — | — |
| James B. Power | $NW^4$ | 25 | 143 | 58 | 160 | — | — | — | 600 | — | 480 | — | 39 | — | — |
| C. H. Davis | $W^2$ of $SE^4$ | 15 | 138 | 58 | 80 | — | — | — | 240 | — | 240 | — | 32 | — | — |
| A. Sargent | $E^2$ of $SW^4$ | 15 | 138 | 58 | 80 | — | — | — | 240 | — | 240 | — | 32 | — | — |

Against the objection of plaintiff's counsel, who excepted to the ruling and assigns error upon it in this court, the defendant served an amended answer, which, among other allegations, contained the following: "That said abbreviations and combination of letters and figures were in general use in Barnes County, North Dakota, and throughout the State of North Dakota, and throughout those parts of the United States where the government system of survey is used, for the description of parts of sections of land, and were generally understood by the people and taxpayers of said Barnes County, and the State of North Dakota, and in those portions of the United States where the government system of survey of lands is used, and where, when applied to descriptions of lands, abbreviations of said descriptions of halves and quarters of sections and smaller subdivisions. That the said figure two placed at the right, and opposite the upper portion of the proper letter indication, east, west, north, or south, is generally used and generally understood throughout the State of North Dakota, and throughout those portions of the United States in which said government system of survey is used, as meaning 'one half' when applied to descriptions of land; and the said figure four placed at the right, and opposite the upper right-hand portions of the abbreviations N. E., S. E., S. W., or N. W., when applied to descriptions of land, is generally used and understood throughout the State of North Dakota, and those portions of the United States where the said government system of survey is used, as meaning 'one-quarter,' and the said figure "two" and the said figure "four" are so as aforesaid used and understood in place of the fractions one-half and one-fourth. That said abbreviations and combinations of letters and figures are uniformly used by this plaintiff in describing parts of sections of land, and were at the time of said assessment well understood by him. That said abbreviations and combinations of letters and figures are in general use in the general land offices of the United States, and in the land office in the district in which said Barnes County is situated, and in the offices of the various auditors, treasurers, and

registers of deeds throughout the State of North Dakota, and have been so used since the organization of said local land offices and since the organization of said county, and have been so used by the occupants of said lands in correspondence with reference to the same, and are more frequently used than any other abbreviations or combinations of letters and figures to indicate parts of sections of land."

The case was tried by the court, and at the trial defendant's witnesses upon the question of usage were not cross-examined, and plaintiff offered no rebutting evidence on that branch of the case. The court found for the defendant upon the question of usage, and made its findings of facts substantially in the language of the amended answer, as above set out. Plaintiff excepted to such findings as follows: The evidence does not show a uniform usage; it only tends to show that such characters are known and used for private convenience by a class of experts. The evidence upon the question of usage is in the record. The trial court held that said descriptions of the several tracts of land were sufficient, and that the taxes based thereon were regular and valid taxes; but also found that certain irregularities occurred as to the sales which rendered the sales illegal, and adjudged that all of the sales were illegal, and that the tax deeds and certificates fell with the sales upon which they were made. Judgment was entered accordingly. Both parties appeal from the judgment.

The pivotal question presented is this: Was it proper and allowable, under established principles of law, for the defendant to allege and attempt to show, by testimony offered in the trial court, that the symbol writing as used in the assessment rolls was and is "generally understood by the people and taxpayers of said Barnes County and the State of North Dakota, and in those portions of the United States where the government system of survey of land is used." We remark, *first*, that in a case recently decided (*Powers* v. *Larabee*, 2 N. D. 141, 49 N. W. Rep. 726) this court, after a very careful consideration, held that descriptions essentially the same as those appearing here were insufficient. In that

case we said: "We hold that the alleged description is wholly insufficient as a description of the lands in question, or of any lands, and that it cannot be sustained as a means of indentifying the lands for purposes of assessment for taxation, or for the ulterior purpose of transferring the title of the reality from the general owner to the tax-title holder and his successors in interest. The alleged description is neither written out in words, nor is the same expressed by charters or abbreviations commonly used by conveyancers, or generally understood and used by the people at large, in describing land. The description of realty placed in the assessment roll is the means of identifying or describing the land for all the subsequent steps in the process of taxation and sale, if a sale is made. The official who makes the tax list and duplicate and the official who collects the tax, or sells and conveys the land, or certifies to its redemption from sale, are governed by the original description in the roll, and are not authorized by law to change the same;" citing *Keith* v. *Hayden*, 26 Minn. 212, 2 N. W. Rep. 495. There has no case been cited, and we know of none, which directly passes upon the sufficiency of the particular descriptions in question aside from those we have mentioned. No authority can be shown, we think, which sustains such descriptions, and it is significant (in view of the claim made by defendant's counsel that such descriptions are in general and common use, not only in this state but in all states where the government system of land surveys exists) that the validity of such descriptions has never been drawn into review in the courts of last resort except in the two cases cited, and then only to be condemned as unauthorized by general usage. In the cases cited, no evidence was introduced tending to prove or disprove the existence of the alleged general usage in question, and yet both courts declared and held, distinctly and emphatically, that no such general usage did exist. In *Keith* v. *Hayden*, the court says: "There is no general usage of this kind; neither is this the import of the letters and figures employed, according to the common and ordinary usage of the English language, as the same is spoken or written

in this state, or in general, nor as it is used in the judgments of courts." In *Powers* v. *Larabee* this court used the following language: "The description is not expressed in common language; nor are the characters and abbreviations employed such as are used by conveyancers in describing real estate; nor do the people generally use such a combination of words, letters, and figures in referring to or describing land." It is elementary that courts will take judicial notice of the vernacular language of the people and of its mutations, and hence, will take notice whether given words, letters, and figures which are brought to the notice of the court are or are not couched in the ordinary language in use by the court and people. In the cases cited the holding was in effect that the arbitrary combinations of letters and figures, as used in the respective assessment rolls, is not the language of the court or country, *i. e.* is not the English language as commonly used. An inspection of the symbol writing will at once show the correctness of this view. The figure 2, according to its established meaning, represents two units or whole numbers, and the figure 4 represents four units or whole numbers. As employed in the assessment rolls, 2 is made to signify one-half of one whole number, and 4 one-fourth of a whole number. Thus it appears that the symbols in question consist of a combination of letters and figures whereby such letters and figures are perverted from their established signification and use among the people, and made to signify something radically different when used to describe land. It is a matter of which this court will take notice, because a matter of common knowledge, that the government system of surveying land has been quite generally adopted in the western states, and that the system prevails in the States of North Dakota and Minnesota; and yet, as has been shown, the courts of last resort in the two states mentioned have taken judicial cognizance of the fact, and so held that the symbol writing in question, as a mode of describing land, has not the sanction of general usage in either of the said states. In view of these adjudications —that of *Powers* v. *Larabee*, being very recent, and made after

mature deliberation—we think it would be unwise to hold that evidence is admissable to prove only such facts as the court would be bound to judicially note without proof, if such facts really exist. If it be true that the symbol writing is, as alleged by the answer, used in describing land, and "generally understood" by the taxpayers and the people of North Dakota and throughout the western states, the judges and courts of such states are bound to judicially note the existence of such usage. To borrow the words of Chief Justice Caton, "courts will not pretend to be more ignorant than the rest of mankind." If evidence became necessary in this case to prove that the usage in question was generally understood and in common use by the taxpayers and people of this state and of the western states generally, then, and for the same reason, evidence would be needed to certify the same facts to any other trial court in the state in which the question might arise. *Vanada* v. *Hopkins*, (Ky.) 19 Amer. Dec. 92; *Bailey* v. *Publishing Co.*, 40 Mich. 251; 12 Am. & Eng. Enc. Law, p. 197, note 1.

The judges of the Supreme Courts of Minnesota and North Dakota alike rest under an official obligation to notice without proof such usages and customs as have become general among all classes of people in these states; yet in both states the courts have held squarely that the symbol writing, such as is found in the tax rolls in this case, has not the sanction of general usage in such states, respectively. When a usage becomes general, the courts will notice the same. Bish. Cont. § 445. It is true that many usages are not judcially noticed in the courts. Such usages are often shown to exist by testimony. "The leading distinctions between customs, considered as usage, and law, is that the former is restricted to a particular locality or class of persons, or business, while the latter is universal throughout the state." Section 446, Id. When a usage is special, *i, e.* limited to a particular locality or business or class of persons, the judges are not always supposed to be aware of its existence, and hence proof is sometimes resorted to, when the fact is disputed, to establish or disprove the existence of the usage. Section 450, Id. When it is shown that

a particular usage existed and was known to the parties to the contract, such usage may, and often does, modify the contract. Sections 449, 456, Id.   Blackstone makes the same distinction, and defines the two classes of customs as follows: "General customs, which are the universal rule of the whole kingdom, and form the common law in its strict and more usual signification; particular customs, which for the most part affect only the inhabitants of particular districts."   1 Bl. Comm. 67.   The books are replete with decisions illustrating and applying the general doctrine that special customs and the usages of trade may be shown by testimony produced in court for the purpose of modifying contracts.   *Barnard* v. *Kellogg*, 10 Wall. 383; *Walls* v. *Bailey*, 49 N. Y. 464; *Collender* v. *Dinsmore*, 55 N. Y. 200.   But, as we have seen, such customs as have ceased to be special *i. e.* local as to territory or limited as to classes, and have become generally known, used and understood by the people and taxpayers of the whole state, and of many other states, no longer need to be proved, because all courts and judges are bound to know such matters of fact and such usages and customs as are so notorious as to be commonly known.   This general proposition is elementary.   Stev. Dig. Ev. 124, and notes.   The matters judicially noticed are very numerous, and need not be enumerated here.   It will suffice to say that all authorities agree that the vernacular language, and such ordinary abbreviations as are in common use, are noticed without proof.   Reyn. Ev. 68.   To prove facts commonly known is regarded by the courts as a waste of time, and for that reason is not permitted.   Id. p. 66.   While authority abounds showing that special customs may be established by testimony, we have searched laboriously, but in vain, for a precedent which authorizes the introduction of evidence to establish the existence of a custom of language which is alleged to be generally known and understood by the taxpayers and people throughout an entire state or nation.   It is in our view, obviously unsound to argue that the courts or judges of a state or nation may be considered as unaware of the existence of a custom of language which

is claimed to be so notorious that it is known and used generally by the taxpayers and people throughout the entire state or nation. At all events it is fundamental in the law that courts are bound to know such notorious facts, matters and usages of language as are generally known to other people. We are not regardless of the fact that the English language has reached its present state by processes of growth and development, and that new words, phrases, and abbreviations are from time to time ingrafted upon the body of the language. The process of growth and accretion will continue, and it is possible, though we do not expect the event, that the shorthand or symbol writing in question will cease to be what we now consider it, viz: a special clerical usage limited in its use, for the most part, to certain officials (United States land office officials and certain county officials) and their clerks and deputies, and emerge into common use. Should this transpire, courts and judges, under their oaths of office, will take judicial cognizance of the event, and will then uphold the validity of the symbol writing in assessment rolls as a basis of taxation, and of building up and transferring title to real estate. Should the symbol writing become general as a means of describing land, there would then be no more occasion to offer proof of the usage than there now is to establish any other common usage of the vernacular language. In the event supposed, the symbol writing, as a means of describing realty, would be quite as familiar to all who speak and write the language, including all well informed women and advanced pupils in the public schools, as the older methods are now familiar to them, i. e. descriptions by the use of English words or common fractions.

It is manifestly true that if the symbol writing can be established as a common custom, by a finding of fact based upon testimony, it must follow that its nonexistence as a common custom can be certified in the same manner. To illustrate our meaning, let us suppose that, instead of standing upon his objection to filing the amended answer, plaintiff's counsel has seen fit to appear and cross-examine defendant's witnesses, and then had

offered rebutting testimony sufficiently strong to have overcome
defendant's testimony, as we think would not have been at all
difficult to do.   Then in the hypothetical case the finding of the
trial court as to the usage must have been the exact opposite of
that which is before us.   But shall so important a matter as the
existence or nonexistence of a general usage of language or
symbol writing in describing land turn upon the varying financial
abilities of suitors, or the uncertain vigilance and skill of counsel
in arraying testimony, where the amount of testimony, from the
nature of the case, is practically inexhaustable?   There is, we
think, practically no limit to the number of witnesses *pro* and *con*
who will honestly testify to the result of their personal experiences
and observations as to the prevalance and extent of the custom.   In
one case the affirmative side will preponderate, and in the other
the negative.   But to place the public revenues and titles to land
upon such a shifting basis would be to rest them upon a foundation
of quicksand.   This argument has been anticipated, and to meet
it counsel cite 2 Greenl. Ev. 249.   We quote from the author a
paragraph which counsel have italicized in their brief: "And after
having been frequently proved in the course of successive legal
investigations, * * * will take notice of it without further proof."
According to this, the courts are not to take cognizance of a
usage until it has been "frequently proved."   When not proved
at all, or when disproved, the holdings would, according to this,
be different.   But the learned commentator is here confining his
observations to a particular class of special customs, *i. e.* "usages
of trade."   It would have been nearer the mark, we think, from
the standpoint of defendant's counsel, to have cited the previous
section,—248.   There the author is treating of a still wider class
of "special customs," viz: "local customs,"—"established by com-
mon consent and uniform practice from time immemorial."   But
in both sections of the treatise the learned commentator is con-
fining his remarks to "special customs."   As has been shown,
such customs and usages are very frequently proven in court as a
means of interpreting contracts, and sometimes to annex terms

to contracts. But reference to the averments of the amended answer shows that the idea of a special custom is distinctly negatived by the answer; nor would counsel contend that a mere special custom should receive judicial sanction as a means of building up title to land. A description in the tax roll, adjudged to be valid, in one county or locality in the state, must be held good in all parts of the state; otherwise, chaos in tax proceedings and in land titles would supervene.

The considerations already advanced have satisfied a majority of this court that the averments as to a general usage of language pleaded in the amended answer present a state of things which ought not to be left to the chances of *nisi prius* trials, and be permitted to be proved or disproved, as it might turn out. Hence we shall sustain plaintiff's assignment of error predicated upon the order of allowing the amended answer to be served and filed. The chief justice, (Judge Bartholomew,) while fully agreeing with the majority of the court in holding that the descriptions in question are without the sanctions of any general custom or law, and hence are insufficient as a basis of taxation, prefers to rest his concurrence on this branch of the case upon a somewhat different line of reasoning. I quote his language: "A description of realty in an assessment roll, to be sufficient, must be such a one as the law recognizes. It is not enough that it be such as may be, in fact, understood, or often or generally used. It must be such as must be understood in the sense that the law will not listen to the declaration that it is not understood. A defective or ambiguous description in a deed or contract may be cured by ascertaining the intention of the parties to the instrument, and giving effect to such intention. But this cannot apply to an assessment. Tax proceedings are in *invitum*, and there are no contracting parties. Primarily, the description must be such that it must be understood by, and will not mislead, the owner. It must also go further, and be such as must be understood by all persons desiring to purchase at tax sale. Theoretically this includes all persons capable of contracting.

A description that must be thus generally understood should have a more certain basis than a mere fact, because ignorance of fact can always be used as an excuse or defense. It must be based upon the law, and this may be upon an express statute authorizing the description, or it may be upon common law, or, what is the same thing, custom. Sir William Blackstone said, in substance, that was the pride of the English common law that it was but the customs of the people, adopted by themselves, and resting upon immemorial usage. 1 Bl. Comm. 73, 74. There is a clear distinction between usage, however general, and custom. Usage is local practice, and must be proved. Custom is general practice, judicially noticed without proof. Usage is the fact. Custom is the law. There may be usage without custom, but there can be no custom without usage to accompany or precede it. Usage consists of a repetition of acts. Custom arises out of this repetition. Usage is the evidence of custom. Usage is inductive, based on consent of persons in a locality. Custom is deductive, making established local usage a law. Whart. Ev. § 965; And. Dict. Law, 'Custom' and 'Usage.' From these definitions it would seem to follow that there may exist a usage that would affect or control a contract, and yet not reach the dignity of a custom or law; and it has been so ruled. *Carter* v. *Coal Co.*, 77 Pa. St. 290; *Morningstar* v. *Cunningham*, 110 Ind. 333, 11 N. E. Rep. 593. These distinctions between usage and custom have not always been observed. The words are often used interchangeably, and not a little confusion has followed this inadvertance. But if we give proper prominence to the thought that one is fact, and the other law, the intricate question in this case, arising upon an attempt to plead and prove usage, is, to my mind, resolved without difficulty. Law, speaking without reference to the exceptions, is not a subject of proof. In no branch of the law is certainty and uniformity more imperatively demanded than in that branch that deals with the transfer of title to real property. A description which is not good in every portion of the state can be good in no portion. From the very definition of usage it is

not within its province to fix this uniformity. That can only be done by law. I do not care to go as far as to hold that the nature and extent of a usage may not be shown in any case in order that the court may deduce therefrom a custom, although this would generally be unnecessary, as courts would recognize a usage that was so universal, ancient, and certain that it would support a custom without evidence. But from the nature of our circumstances, no usage can exist in this state that would support the custom that must obtain before descriptions such as were used in this case can be upheld. Vast portions of our area yet belong to the general government. Some of it is yet unsurveyed; some counties but recently organized; others yet unorganized. It is not possible that in such localities any 'usage' as to real-estate descriptions, in the proper sense of the word, can have an existence. It cannot be that persons who seek to occupy these lands are required to take notice of a usage of which they have no knowledge in fact, and which never obtained in their locality. If once we hold such descriptions good, we establish the custom, and make it the law of the state forever afterwards, unless annulled by the legislature. This we ought not to do until our conditions change. The trial court erred in holding the description good."

But counsel claim that the description of the tracts involved here is sufficient if the symbol writing be ignored and rejected. They say in their brief: "Part of section 25, in township 141, of range 59, containing 80 acres, owned by James B. Power," is sufficient, because, as they say, it would not mislead the owner. We think that whether such a description would mislead the owner or not might depend largely upon the number of 80-acre tracts belonging to him in the section; also upon the situation of the various tracts which he might own with reference to the quarter sections. Whether the 80 acres was or was not in a solid body would also be an important factor, we think. It is, in our judgment, important to keep in view the fact that others besides owners of land have a vital interest in descriptions of lands in

tax rolls. Delinquent lands are sold for taxes, and titles are to be built up and perpetuated on such sales. When lands are offered at tax sales, it is important to the public revenue, as well as to purchasers, that some definitely ascertained tract or tracts should be put up for sale. There would be little inducement to buy if the parcels offered are not pointed out by some apt and suitable description familiar to the public, which would enable a purchaser to identify, not merely a tract, but the particular parcel purchased. *Bidwell* v. *Webb*, 10 Minn. 59, (Gil. 41;) Black, Tax Titles, § 38; 1 Desty, Tax'n, 564. To us the proposition that fractions of whole sections need not be designated in a tax roll further than by giving the section, town, range, and number of acres, in connection with the owner's name, is novel, and somewhat startling. Our observation and study have led us to believe that the practice of describing parts of sections in tax rolls, as well as in deeds of conveyance, is universal at the west. We are certain that the statute in force when these lands were assessed required such descriptions in addition to the other data mentioned. Comp. Laws, § 1582; also Id. § 1544. Section 1582 provides that the assessment roll, among other things, shall contain a list of lands, "with the number of acres in each tract set opposite the same." To set the number of acres down in the roll opposite the tract necessitates a description of the tract in connection with the number of acres. We think this statute is not only plain, but is likewise mandatory. It is well settled that a description in a tax proceeding—which is a proceeding in *invitum* —that is inherently and fatally defective cannot be helped out and validated by extrinsic evidence. It is also true that where premises have acquired a name or description by repute, though not technically correct, the same will suffice for purposes of taxation, and parol evidence is competent to show the name acquired by repute coincides with the proper description of such land. *Gilfillan* v. *Hobart*, 34 Minn. 67, 24 N. W. Rep. 342. This line of authority is clearly not in point in the case at bar. There is neither allegation in the answer nor claim that the lands of the

plaintiff have acquired any name or designation by repute which is peculiar and different from other lands situated within government surveys in the state. On the contrary, the assertion is emphasized in the answer that the descriptions of the lands in suit are technically accurate, and conform precisely to a usage of language which is general in describing lands in this state. See extract from amended answer, *supra*; also, *Knight* v. *Alexander*, 38 Minn. 384, 37 N. W. Rep. 796.

Counsel make the further point that inasmuch as § 1554, Comp. Laws, required taxpayers to "list all property subject to taxation." and because it does not appear from "annotations on the roll" that plaintiff's property was in fact listed by the assessor, that the court must conclusively presume that plaintiff not only made a statement of his property, as required by § 1547, but the plaintiff furnished the assessor a list in which the lands in question were described by precisely similar symbols to those now appearing on the roll. In support of this point, counsel cite § § 1549, 1550, Comp. Laws, to show that, where the taxpayer fails or refuses to list his property, it then becomes the duty of the assessor to "note the fact on the roll," and return it to the auditor. We did not so read the two sections last cited. Said sections we think, have reference to documents of a different character from the "return" and roll, viz: to lists such as the county commissioners are required, under § 1544, to furnish all assessors. We have found a section—one not cited—which we think is the only one which requires an assessor in a case of failure or refusal to list to note the fact on the roll or "return." But this is confined to "personal property," and the ommission to include real estate is, we think, significant, and implies, at least, that no such annotation on the roll is to be made as to real estate. Comp. Laws, § 1583. This view is strengthened by a requirement of law that the county commissioners shall furnish assessors in each year blank forms for listing, containing "a list of all the entered lands in his county subject to taxation," which list shall contain "lands by township, range and section, and any division or part of a section." Where the owner

is neither absent or unknown, it becomes the duty of the assessor both to "ascertain and value" the property. Section 1548. In the total absence of proof we cannot assume in any case that the owner was not absent and not unknown, and that the assessor did not ascertain and value his property for one or the other reason. In this case for a special reason, that theory cannot be indulged. The answer expressly avers that said land "was by the assessor of said Barnes County duly assessed for taxation at its true value." It is true, and the fact has been a source of embarrassment to this court, that the statutes governing the listing and assessing of these lands were conflicting, and far from being clear in meaning. Yet one thing stands out with clearness and certainty, and that is the fact that the entire responsibility for describing property in the "roll" is devolved by statute upon the assessor. It is that official who is requied to make out and deliver to the county clerk a "return" or "roll." Comp. Laws, § § 1550, 1582. It is with the descriptions of land in the return or roll that we are dealing in this case. Such description must govern in all subsequent steps in the process of taxation, and in transferring the title of land sold for taxes and not redeemed. It certainly would be the duty of the assessor, in making out his roll, to have recourse to any lists of property furnished him, either by his official superiors, the county commissioners, or by taxpayers individually; but as between lists differing as to description the arbiter must be the assessor himself, whose official duty it is to make out and deliver a roll containing sufficient descriptions. We cannot see, in view of all the provisions of the statute, that an assessor can avoid full responsibility for all descriptions and other data in the roll. Moreover, as has been seen, we are of the opinion that a description of realty essentially insufficient cannot be upheld as a basis of taxation, or for building up title under the revenue laws, even when such description is furnished by the owner. The public and purchases at tax sales, and their successors, have an interest in descriptions of land as well as owners. We think the weight of authority supports our view

upon this point, but we are aware that some cases hold that, where the owner furnishes the exact description involved, he is estopped from questioning its sufficiency.

In conclusion we feel like saying that every member of this court has given to this case his very best and most faithful consideration. We appreciate the importance of the questions involved, relating, as they do, to the public revenues, and bearing vitally, also, upon the stability of land titles in this state. We readily concede that views differing from ours may be and are honestly entertained; but we have concluded that stability in a rule of property, when once deliberately adjudged, is of prime importance, and hence have adhered to the views laid down in the previous decisions. Moreover, we believe that comparatively a small number of the whole population have any degree of familiarity with the symbol writing in question. Those who have close relations with the local land offices, and with such of the county officers as have copied and adopted the symbol writing from the land officers, are indeed strongly impressed with the idea that all of the people understand and use this mode of describing land. We cannot come to the same conclusion. We think symbol writing in tax records has already disappeared, and is no longer employed in county offices in this state, and our belief is strong that when the public land has been disposed of, and the local land offices have performed their limited and temporary functions and have been removed further west, it will be found that symbol writing in describing realty will have failed to become ingrafted upon the vernacular language. We feel justified in this conclusion from our observations and experience in the older states of the west. If we are mistaken, the remedy can be readily found in the legislative branch of the government, where a statute can be passed to govern future assessments. See "The Elements of Jurisprudence," by T. E. Holland, p. 54.

The judgment entered below must be reversed, and a new judgment entered, quieting title in the plaintiff, and also setting aside the taxes on the land in question for the years 1886, 1887, and

1888, and vacating all tax deeds and certificates described in or referred to in the amended answer. Neither party will recover costs or disbursements in this court. The District court will enter judgment accordingly.

(54 N. W. Rep. 404.)