Appeal of Robert Nielsen.

Robert NIELSEN, Appellee,

v.

SOCIAL SERVICE BOARD OF NORTH DAKOTA, Appellant.

Civ. No. 8936.

Supreme Court of North Dakota.

March 27, 1974.

Allen I. Olson, Atty. Gen., and Milton E. Moskau, Special Asst. Atty. Gen., Bismarck, for appellant.

Dwight S. Cuffe, Fargo, for appellee.

Bruce E. Bohlman, Grand Forks, as amicus curiae.

PAULSON, Judge.

This is an appeal by the Social Service Board of North Dakota from a judgment of the District Court of Cass County, which judgment held that Robert Nielsen is eligible to receive medical assistance

from the State of North Dakota; and which judgment held unconstitutional that portion of Chapter 330, § 3, paragraph 3 of the Social Work Manual of the Social Service Board of North Dakota which provides:

".  .  .  for purposes of Medical Assistance, an applicant will establish residence within the state and county regardless of living arrangement, providing that he has not come to North Dakota for the primary purpose of becoming eligible to receive medical care."

Robert Nielsen was born at Wolverton, Minnesota, on June 16, 1931. He graduated from Moorhead State College in 1953 and taught in the public school systems in Henning and Fosston, Minnesota, for six years. His teaching career was cut short in 1959 by multiple sclerosis. Mr. Nielsen then established his residence with his parents in Wolverton, Minnesota, so that they could care for him, and he lived there at his parental home until March 17, 1972. During the period from 1959 when he became too ill to teach any longer to March 17, 1972, he was the recipient of medical assistance from the State of Minnesota through its Wilkin County Welfare Department.

Mr. Nielsen's father died in 1970 and his mother suffered a heart attack in 1972. Thereafter, because his mother could no longer care for him, Mr. Nielsen was advised by a physician and a nurse to enter a nursing home for care. On March 17, 1972, he was admitted to the Elim Nursing Home in Fargo, North Dakota. The Wilkin County Welfare Department of Minnesota terminated Mr. Nielsen's medical assistance grant from the State of Minnesota effective May 1, 1972.

On June 9, 1972, Mr. Nielsen's mother, on his behalf, applied to the Cass County Welfare Board for medical assistance to defray his nursing home costs. Such application was denied on the ground that Mr. Nielsen was not a resident of North Dakota for medical assistance purposes.

Thereafter, Mr. Nielsen requested an administrative hearing before the Social Service Board of North Dakota, which request was granted. The decision of the Cass County Welfare Board denying Mr. Nielsen's application for medical assistance was affirmed at such administrative hearing and thereafter he appealed this decision to the Cass County District Court.

The medical assistance for which Mr. Nielsen has applied is administered pursuant to the guidelines of a State plan established under Title XIX of the Social Security Act and the federal regulations promulgated thereunder.

The North Dakota Medical Assistance plan was enacted for the purpose of providing medical care and services to persons whose income and resources are insufficient to meet the costs of such care and services. Ch. 50–24.1, N.D.C.C.

An applicant for medical assistance, in order to be eligible for aid to the permanently and totally disabled under the North Dakota Medical Assistance plan must comply with the requirements of § 50–24–03, N.D.C.C., which includes the requirements that such applicant have insufficient income or other resources to provide a reasonable subsistence compatible with decency and health, must have attained the age of eighteen years, and be permanently and totally disabled; as well as being a resident of North Dakota.

The only requirement with which we are concerned in this appeal is that of residence. The Social Service Board of North Dakota concedes that Robert Nielsen has met all other requirements necessary to qualify him to receive medical assistance from the State of North Dakota.

The rules and regulations promulgated by the Social Service Board of North Dakota are contained in its "Social Work

Manual". "Residence" as an eligibility factor for receiving medical assistance is discussed in Chapter 306, § 5, paragraph 1 of such Manual, and provides in pertinent part:

"*State residence*—As the result of a U. S. Supreme Court ruling issued April 21, 1969, there is no durational residence requirement in AABD [the Aid to the Aged, Blind or Disabled program]. No person who is otherwise eligible may be denied assistance if he resides in the state within the meaning of the following definition:

" 'A resident of the state is one who is living in the state voluntarily and not for a temporary purpose, that is, with no intention of presently removing therefrom. Temporary absence from the state, with subsequent returns or intent to return when the purposes of the absence have been accomplished, shall not interrupt continuity of residence.'

Residence as defined for eligibility purposes does not depend upon the reason for which the individual entered the state, except insofar as it may bear upon whether he is here for a 'temporary purpose.' "

The Social Service Board of North Dakota bases its denial of Mr. Nielsen's application for medical assistance on the regulation set forth in Chapter 330, § 3, paragraph 3, of its Social Work Manual, which reads in pertinent part:

"However, for purposes of Medical Assistance, an applicant will establish residence within the state and county regardless of living arrangement, providing that he has not come to North Dakota for the primary purpose of becoming eligible to receive medical care."

The effect of the application of the above residency regulation by the Social Service Board to applicants for medical assistance is to create two classes of North Dakota residents: (1) Those who are residents for all purposes; and, (2) Those who are residents for all but medical assistance purposes because they have entered North Dakota for the primary purpose of becoming eligible to receive medical care.

The issue presented is whether the residency regulation, as applied by the Social Service Board to the factual situation in the instant case, contravenes the United States Constitution.

Mr. Nielsen contends that the residency regulation set forth above in Chapter 330, § 3, paragraph 3, of the Social Work Manual, violates the United States Constitution by denying him the equal protection of the laws under the Fourteenth Amendment and by infringing on his right to freely travel from State to State.

In response, the Social Service Board of North Dakota argues that, because of the application of Federal Regulation § 248.40, Title 45, Code of Federal Regulations, interpreting § 1902(b)(3) of Title XIX of the Social Security Act, Mr. Nielsen is eligible for medical assistance from Minnesota and is therefore not deprived of any constitutional rights by the application to him of the residency regulation.

Section 248.40, in pertinent part, reads as follows:

"(a) *State plan requirements.* A State plan under Title XIX of the Social Security Act must provide that:

.    .    .    .    .    .

"(2) Medical care and services will be provided outside the State to eligible residents of the State, at least in the following situations:

"(i) When it is general practice for residents of a particular locality to use medical resources outside the State .   . ."

Section 1902(b)(3) of Title XIX of the Social Security Act, which has been codified as § 1396a(b)(3) of 42 U.S.C.A., Pub-

lic Health and Welfare, in pertinent part, reads as follows:

> "(b) The Secretary shall approve any plan which fulfills the conditions specified in subsection (a) of this section, except that he shall not approve any plan which imposes, as a condition of eligibility for medical assistance under the plan—
>
> . . . . . .
>
> "(3) any residence requirement which excludes any individual who resides in the State . . ."

The Social Service Board of North Dakota asserts that the practice in the Wolverton, Minnesota, area of using medical facilities in Fargo, North Dakota, is so general that this court should take judicial notice of that fact.

The Social Service Board relies on the following testimony of Mrs. Alex Nielsen, Robert's mother, relative to the Elim Nursing Home at Fargo:

> "Mr. A: [Mr. Wayne J. Anderson, Appeals Referee, Social Service Board]: Were there alternate places for him to go that he considered?
>
> "Mrs. N: [Applicant's mother, Mrs. Nielsen]: No.
>
> "Mr. A: So it really was the closest nursing home to your home in Wolverton and, therefore, it was desirable?
>
> "Mrs. N: Yes.
>
> "Mr. A: Did anyone recommend this home to you?
>
> "Mrs. N: Oh, yes.
>
> "Mr. A: And who was that?
>
> "Mrs. N: There were so many that recommended it as being one of the best homes.
>
> "Mr. A: Was the physician, Dr. Jacobson, one?

> "Mrs. N: No.
>
> "Mr. A: Oh, it was non-professional people?
>
> "Mrs. N: Yes."

We believe that the arguments of the Social Service Board of North Dakota are not persuasive in the instant case for the following reasons:

■ First, the above-quoted testimony of Mrs. Nielsen is not a sufficient basis upon which this court will take judicial notice of the specified situation as a general practice in the area, and the Social Service Board has presented no other evidence to support its contention. See § 31–10–01, N.D.C.C.; Power v. Bowdle, 3 N.D. 107, 54 N.W. 404 (1893); 29 Am.Jur.2d, Evidence § 121, pp. 153–154; 31 C.J.S. Evidence § 30, p. 932.

■ Second, the fact that Mr. Nielsen previously received medical assistance from the State of Minnesota, does not continue to qualify him as a resident of Minnesota at this time and therefore eligible as a recipient of medical assistance under Minnesota's Medical Assistance plan.

■ Finally, Minnesota has chosen not to furnish the necessary medical assistance to Mr. Nielsen, and this court does not have jurisdiction to compel the State of Minnesota through that State's social services program to provide such medical assistance to him.

Accordingly, we hold that § 248.40 of Title 45, C.F.R., is not applicable in the instant case.

In this appeal we are confronted with a residency regulation of the Social Service Board of North Dakota which has been applied by the Board to deny medical assistance to an applicant who is a North Dakota resident, but who is, because of such regulation, classified as a nonresident for medical assistance purposes because he came to North Dakota for the primary purpose of receiving medical care.

We believe that such an application of the residency regulation in the instant case invidiously discriminates against Mr. Nielsen as an applicant for medical assistance and infringes upon his constitutional right to travel freely from State to State.

The United States Supreme Court in Shapiro v. Thompson, 394 U.S. 618, 89 S. Ct. 1322, 22 L.Ed.2d 600 (1969), considered the statutory durational residency requirements for welfare recipients of Pennsylvania, Connecticut, and the District of Columbia, which statutes denied welfare assistance to persons who, in their applications for welfare assistance, claimed they were residents, and who met all other eligibility requirements except that they had not resided within their respective jurisdictions for at least one year immediately preceding their applications for such assistance.

The United States Supreme Court, in *Shapiro, supra,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600, in paragraphs 1, 2, 3, and 5 of the syllabus, held:

"1. The statutory prohibition of benefits to residents of less than a year creates a classification which denies equal protection of the laws because the interests allegedly served by the classification either may not constitutionally be promoted by government or are not compelling governmental interests.

"2. Since the Constitution guarantees the right of interstate movement, the purpose of deterring the migration of indigents into a State is impermissible and cannot serve to justify the classification created by the one-year waiting period.

"3. A State may no more try to fence out those indigents who seek higher welfare payments than it may try to fence out indigents generally.

"5. In moving from jurisdiction to jurisdiction appellees were exercising a constitutional right, and any classification which penalizes the exercise of that right, unless shown to be necessary to promote a *compelling* governmental interest, is unconstitutional."

Mr. Justice Brennan, in discussing the constitutional right of interstate travel in *Shapiro, supra* 394 U.S. at 629–631, 89 S. Ct. at 1329, stated:

"This Court long ago recognized that the nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement. That proposition was early stated by Chief Justice Taney in the *Passenger Cases,* 7 How. 283, 492, 12 L.Ed. 702 (1849):

" 'For all the great purposes for which the Federal government was formed, we are one people, with one common country. We are all citizens of the United States; and, as members of the same community, must have the right to pass and repass through every part of it without interruption, as freely as in our own States.'

"We have no occasion to ascribe the source of this right to travel interstate to a particular constitutional provision. It suffices that, as Mr. Justice Stewart said for the Court in United States v. Guest, 383 U.S. 745, 757–758, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966):

" 'The constitutional right to travel from one State to another . . . occupies a position fundamental to the concept of our Federal Union. It is a right that has been firmly established and repeatedly recognized.

" '. . . [The] right finds no explicit mention in the Constitution. The reason, it has been suggested, is that a right so elementary was conceived from the beginning to be a necessary concomitant of the stronger

Union the Constitution created. In any event, freedom to travel throughout the United States has long been recognized as a basic right under the Constitution.' "

■ The United States Supreme Court then proceeded to impose the requirement of a compelling governmental interest in any case where the exercise of the right of interstate travel has been limited by a governmental classification, and, in *Shapiro, supra* 394 U.S. at 634, 89 S.Ct. at 1331, stated:

"The waiting-period provision denies welfare benefits to otherwise eligible applicant solely because they have recently moved into the jurisdiction. But in moving from State to State, or to the District of Columbia appellees were exercising a constitutional right, and any classification which serves to penalize the exercise of that right, unless shown to be necessary to promote a *compelling* governmental interest, is unconstitutional. Cf. Skinner v. Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L. Ed. 1655 (1942); Korematsu v. United States, 323 U.S. 214, 216, 65 S.Ct. 193, 194, 89 L.Ed. 194 (1944); Bates v. Little Rock, 361 U.S. 516, 524, 80 S.Ct. 412, 417, 4 L.Ed.2d 480 (1960); Sherbert v. Verner, 374 U.S. 398, 406, 83 S.Ct. 1790, 1795, 10 L.Ed.2d 965 (1963)."

The rationale of *Shapiro* was recently reaffirmed in Memorial Hospital v. Maricopa County, —— U.S. ——, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974), wherein the United States Supreme Court struck down an Arizona statute requiring one year's residence in a county as a condition to an indigent's receiving nonemergency hospitalization or medical care at the county's expense.

The United States Supreme Court, in *Memorial Hospital*, interpreted the scope and effect of its earlier holding in *Shapiro*, as follows:

"Although any durational residence requirement impinges to some extent on the right to travel, the Court in *Shapiro* did not declare such requirements to be *per se* unconstitutional. The Court's holding was conditioned, at 394 U.S. 638 n. 21, 89 S.Ct. 1333, by the caveat that some 'waiting-period or residence requirement[s] . . . may not be penalties upon the exercise of the constitutional right of interstate travel.' The amount of impact required to give rise to the compelling state interest test was not made clear. The Court spoke of the requisite impact in two ways. First, we considered whether the waiting period would deter migration: . . .

Second, the Court considered the extent to which the residency requirement served to *penalize* the exercise of the right to travel (emphasis U.S. Court's). ·

. . . . . .

"Thus, *Shapiro* and *Dunn* [Dunn v. Blumstein, 405 U.S. 330, 339–340, 92 S. Ct. 995, 31 L.Ed.2d 274 (1972)] stand for the proposition that a classification which 'operates to *penalize* [emphasis U.S. Court's] those persons . . . who have exercised their constitutional right of interstate migration,' must be justified by *a compelling state interest* [emphasis ours].

. . . . . .

"Whatever the ultimate parameters of the *Shapiro* penalty analysis, it is at least clear that medical care is as much 'a basic necessity of life' to an indigent as welfare assistance. And, governmental privileges or benefits necessary to basic sustenance have often been viewed as being of greater constitutional significance than less essential forms of governmental entitlements."

We adopt the rationale of the United States Supreme Court in *Shapiro* and *Memorial Hospital* and apply the same in the instant case because, both in *Shapiro* and *Memorial Hospital,* and in the case at bar, a governmental classification has been improperly applied to impose an additional burden on persons who are attempting to

exercise their right to travel freely from State to State. While the instant case does not contain a durational residency requirement as *Shapiro* and *Memorial Hospital* did, we believe that the residency requirement of the Social Service Board, as applied in the instant case, has the same effect in that it deters migration and penalizes the right of interstate travel. In fact, since the regulation in the instant case creates an irrebuttable presumption that a person who has come into North Dakota for the purpose of receiving medical assistance is a nonresident, regardless of his intent to become a bona fide resident and regardless of the fact that he may be a bona fide resident for all other purposes, we believe that such residency requirement imposes a more substantial infringement on the right to interstate travel than the usual durational residency requirement. The applicants in *Shapiro* and *Memorial Hospital* were required to wait one year before they could receive the state services for which they applied. In contrast, Mr. Nielsen has no such limited waiting period by which he could eventually, if otherwise eligible, qualify for medical assistance at a fixed future date; but, instead, under appellant's contention, Mr. Nielsen would be forever classified as a nonresident and thus ineligible for medical assistance purposes.

■ Applying the rationale of *Shapiro* and *Memorial Hospital* to the instant case, we believe that the residency regulation as applied to Mr. Nielsen creates an "invidious classification" that impinges on his right of interstate travel by denying him the "basic necessities of life". Such a classification can only be sustained on a showing of a compelling state interest.

Because the Social Service Board of North Dakota has failed to set forth any compelling governmental interest whatsoever to justify the classification created by the residency regulation, we hold that the residency regulation of paragraph 3, of § 3, of Chapter 330 of the Social Work Manual of the Social Service Board of North Dakota is unconstitutional as applied to the instant factual situation. Tang v. Ping, 209 N.W.2d 624 (N.D.1973). We hold that Mr. Nielsen is eligible to receive medical assistance under the North Dakota Medical Assistance for Needy Persons plan, and the judgment is affirmed.

ERICKSTAD, C. J., and VOGEL, J., concur.

TEIGEN, Judge (dissenting).

I dissent. The regulation of the Social Service Board found in Chapter 330, § 3, ¶ 3, of the Social Work Manual, read in the light of the rest of that chapter, and § 1902(b)(3) of Title XIX of the Social Security Act, § 1396a(b)(3) of 42 U.S.C.A., and Federal Regulation § 248.40, Title 45, Code of Federal Regulations, is not, in my opinion, unconstitutional as being violative of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, nor was it being unconstitutionally applied in this case.

I agree that the right of interstate travel has repeatedly been recognized as a basic constitutional freedom. However, this right to travel was involved in only a limited sense in Shapiro v. Thompson, 394 U. S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), the case upon which the majority rely. In Memorial Hospital v. Maricopa County, —— U.S. ——, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974), the United States Supreme Court held that the durational residence requirement of an Arizona statute requiring a year's residence in a county as a condition for receiving nonemergency hospitalization or medical care at the county's expense by an indigent was unconstitutional, as it created an "invidious classification." In that case the court points out the scope of right to travel, as limited in *Shapiro*, as follows:

"The Court was there concerned only with the right to 'migrate, with intent to settle and abide' or, as the Court put it, 'to migrate, resettle, find a new job and

start a new life.' 394 U.S., at 629, 89 S. Ct. at 1328. Even a bona fide residence requirement would burden the right to travel, if travel meant merely movement. But, in *Shapiro*, the Court explained that '[t]he residence requirement and the one-year waiting-period requirement are distinct and independent prerequisites' for assistance and only the latter was held to be unconstitutional. 394 U.S., at 636, 89 S.Ct. at 1332. Later, in invalidating a durational residency requirement for voter registration on the basis of *Shapiro*, we cautioned that our decision was not intended to 'cast doubt on the validity of appropriately defined and uniformly applied bona fide residence requirements.' Dunn v. Blumstein, 405 U. S. 330, 342 n. 13, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274 (1972)." Memorial Hospital v. Maricopa County, *supra*, —— U.S. at ——, 94 S.Ct. at 1080.

In Starns v. Malkerson, 326 F.Supp. 234 (D.C.1970), aff'd 401 U.S. 985, 91 S.Ct. 1231, 28 L.Ed.2d 527 (1971), and Vlandis v. Kline, 412 U.S. 441, 93 S.Ct. 2230, 37 L. Ed.2d 63 (1973), the United States Supreme Court upheld, as constitutional, durational residence requirements for instate university tuition.

It is also noted in *Memorial Hospital*, —— U.S. at ——, 94 S.Ct. at 1081, in further commenting on *Shapiro*:

"Although any durational residence requirement impinges to some extent on the right to travel, the Court in *Shapiro* did not declare such requirements to be *per se* unconstitutional. The Court's holding was conditioned, at 394 U.S. 638 n. 21, 89 S.Ct. 1333, by the caveat that some 'waiting-period or residence requirement[s] * * * may not be penalties upon the exercise of the constitutional right of interstate travel.' The amount of impact required to give rise to the compelling state interest test was not made clear. The Court spoke of the requisite impact in two ways. First, we considered whether the waiting period would deter migration:

*        *        *        *        *        *

"Second, the Court considered the extent to which the residency requirement served to *penalize* the exercise of the right to travel."

In further commenting on *Shapiro* and making reference to Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), the high court said:

" '*Shapiro* did not rest upon a finding that denial of welfare actually deterred travel. Nor have other "right to travel" cases in this Court always relied on the presence of actual deterrence. In *Shapiro* we explicitly stated that the compelling state interest test would be triggered by "any classification which serves to penalize the right [to travel]. * * *" ' "

Thus in concluding the effect of *Shapiro* and *Dunn* in *Memorial Hospital*, the Supreme Court said: "*Shapiro* and *Dunn* stand for the proposition that a classification which 'operates to *penalize* those persons * * * who have exercised their constitutional right of interstate migration,' must be justified by a compelling state interest. Oregon v. Mitchell, 400 U.S. 112, 238, 91 S.Ct. 260, 321, 27 L.Ed.2d 272 (1971)."

In *Shapiro* the court found denial of the basic "necessities of life" to be a penalty. In *Memorial Hospital*, the court held that medical care is as much "a basic necessity of life" to an indigent as welfare assistance. However, under requirements provided in 45 C.F.R., § 248.40, quoted in the majority opinion, the state plan under Title XIX of the Social Security Act must provide that:

"(2) Medical care and services will be provided outside the State to eligible residents of the State, at least in the following situations:

"(i) When it is general practice for residents of a particular locality to use medical resources outside the State * * *"

For these reasons we have neither of the required elements of durational residence

or penalty required under *Shapiro, Dunn* or *Memorial Hospital* in this case. It is not disputed that the North Dakota or the Minnesota plan for medical assistance to needy persons has been approved by the Secretary of Health, Education and Welfare and complies with C.F.R. requirements. The problem is that the proceedings in this case were started against the wrong party, which, unfortunately, came about because Nielsen is represented by a representative of the Legal Aid Society of North Dakota, Inc., who, on oral argument before this court, admitted that, by regulation, he is prohibited from representing any person who is not a resident of North Dakota. Thus he was precluded, by the regulations of his employer, from commencing a suit on behalf of Nielsen against the Social Service Board of Minnesota, or its counterpart, to compel continuation of medical assistance payments to Nielsen under the Minnesota plan.

Nielsen resided in the small town of Wolverton, in Wilkin County, Minnesota, which is located about twenty miles from the city of Fargo, North Dakota. He had been a recipient of medical assistance from the state of Minnesota for a number of years. On March 17, 1972, when he could no longer be cared for by his mother in her home he was moved, on the advice of his physician, to the Elim Nursing Home in Fargo, North Dakota. The Wilkin County Welfare Board of Minnesota then terminated Nielsen's medical assistance payments, effective May 1, 1972. There is no question but that the people of Wolverton and Wilkin County utilize the medical resources located immediately across the border in Fargo, which is the largest city serving that area.

I agree that the Social Service Board, in the trial of this matter, neglected to introduce evidence firmly establishing the general practice of residents of the locality to use the medical resources located at Fargo, but this is a commonly known fact. Wolverton, Minnesota, is considered a part of the trade territory of the city of Fargo, particularly for medical purposes.

Under the circumstances, I believe that the case should be remanded for new trial, with directions to take evidence on this question and with permission to implead or interplead the appropriate agency of the state of Minnesota after a transfer of the case from state to federal court, or such other procedural steps as may be meet in the premises, to fully litigate the issues involved.

KNUDSON, J., dissents.