## WRIGHT v. JONES et al.

(135 N. W. 1120.)

**Taxation — assessment roll — tax deed.**

1. The case of Power v. Bowdle, 3 N. D. 107, 21 L.R.A. 328, 44 Am. St. Rep. 511, 54 N. W. 404, having been followed for twenty-one years by this court, has established a rule of property in this state. Following said case, it is *held* that a description in the assessment roll as follows:

| Name. | Sec. | Twp. | Range. | Acres. |
|---|---|---|---|---|
| Margaret J. McGibbney, N. W. ¼ ................... 35 | | 149 | 56 | 160 |

cannot support a tax levy, and a tax deed based thereon is void.

**Adverse possession — evidence.**

2. Defendants claim title under § 4928, Rev. Codes 1905, it being their contention that they have been in open, adverse, and undisputed possession of the land under color of title for more than ten years, paying all taxes thereon during said time. Evidence examined and found not to support said claim.

**Inheritance — presumption from absence — evidence.**

3. Plaintiff received one-third interest in the land by grant from the government, and is entitled to have his title thereto quieted, but the remaining two-thirds interest he claims by inheritance from his father, who he asserts is dead. Having no positive proof of such death, he relies upon the presumption arising

Note.—The authorities on the question as to absence from what places gives rise to presumption of death are reviewed in a note in 104 Am. St. Rep. 200. See also note in 46 Am. Rep. 761.

The question of the necessity of inquiry to raise presumption of death from seven years' absence is the subject of notes in 2 L.R.A.(N.S.) 809, and 28 L.R.A.(N.S.) 178.

As to time of death of one presumed to be dead after seven years' absence, unheard of, see note in 26 L.R.A.(N.S.) 294.

from the unexplained absence of his father for seven years under § 7302, Rev. Codes 1905. An examination of the evidence, however, shows that this presumption did not arise. Such presumption only arises upon an unexplained absence from his last known home. Evidence herein not sufficient to show facts upon which to base this presumption.

**Evidence — sufficiency of — finding of trial court sustained.**

4. The evidence regarding an accounting examined and found to fully sustain the finding of the trial court, and is adopted by this court.

Opinion filed April 18, 1912.

Appeal by plaintiff from a judgment of the District Court for Grand Forks County, *Templeton,* J., in defendant's favor in an action brought to recover possession of certain land and for an accounting of rents and profits.

Affirmed.

*Scott Rex,* for appellant.

Presumption of death arises when it is proven that person has not, for seven years or more, been heard from at the place he left, by those who might reasonably be expected to hear from him. Greenl. Ev. § 41; Wigmore, Ev. §§ 2531, 2532; Jones, Ev. § 57; Lawson, Presumptive Ev. rule 44, p. 264; Miller v. Sovereign Camp, W. W. 140 Wis. 505, 28 L.R.A.(N.S.) 178, 133 Am. St. Rep. 1095, 122 N. W. 1126; Holdrege v. Livingston, 79 Neb. 238, 112 N. W. 341; Renard v. Bennett, 76 Kan. 848, 93 Pac. 261, 14 Ann. Cas. 240; Davie v. Briggs, 97 U. S. 628, 24 L. ed. 1086; Winship v. Connor, 42 N. H. 341; Johnson v. Johnson, 114 Ill. 611, 55 Am. Rep. 883, 3 N. E. 232; Freeman's Estate, 227 Pa. 154, 75 Atl. 1063; Kennedy v. Modern Woodmen, 243 Ill. 560, 28 L.R.A.(N.S.) 181, 90 N. E. 1084; Burnett v. Costello, 15 S. D. 89, 87 N. W. 575; Bardin v. Bardin, 4 S. D. 305, 56 N. W. 1069; Smith v. Smith, 5 N. J. Eq. 484; Osborn v. Allen, 26 N. J. L. 388; Hoyt v. Newbold, 45 N. J. L. 219, 46 Am. Rep. 757; Wheelock v. Overshiner, 110 Mo. 100, 19 S. W. 640; Gilroy v. Brady, 195 Mo. 205, 93 S. W. 279; Winter v. Supreme Lodge, K. P. 96 Mo. App. 1, 69 S. W. 662.

Defendants have no title to or interest in the land in suit. State Finance Co. v. Trimble, 16 N. D. 199, 112 N. W. 984; State Finance Co. v. Mulberger, 16 N. D. 214, 125 Am. St. Rep. 650, 112 N. W. 986;

State Finance Co. v. Bowdle, 16 N. D. 193, 112 N. W. 76; State Finance Co. v. Beck, 15 N. D. 374, 109 N. W. 357; Power v. Kitching, 10 N. D. 254, 88 Am. St. Rep. 691, 86 N. W. 737; 26 Am. & Eng. Enc. Law, 959; 21 Cyc. 101; Dohms v. Mann, 76 Iowa, 723, 39 N. W. 823.

*Bangs & Robbins,* for respondent.

Presumption of death did not arise. Burnett v. Costello, 15 S. D. 89, 87 N. W. 575; Davie v. Briggs, 97 U. S. 628, 24 L. ed. 1086; Modern Woodmen v. Gerdom, 72 Kan. 391, 2 L.R.A.(N.S.) 809, 82 Pac. 1100, 7 Ann. Cas. 570 and note; Renard v. Bennett, 76 Kan. 848, 93 Pac. 261, 14 Ann. Cas. 240; Gall v. Gall, 114 N. Y. 109, 21 N. E. 106; Vought v. Williams, 120 N. Y. 253, 8 L.R.A. 591, 17 Am. St. Rep. 634, 24 N. E. 195; Re Board of Education, 173 N. Y. 321, 66 N. E. 11; Shriver v. State, 65 Md. 278, 4 Atl. 679; Schaub v. Griffin, 84 Md. 557, 36 Atl. 443; Spahr v. Mutual L. Ins. Co. 98 Minn. 471, 108 N. W. 4; Manley v. Pattison, 73 Miss. 417, 55 Am. St. Rep. 543, 19 So. 236; Smith v. Combs, 49 N. J. Eq. 420, 24 Atl. 9; Francis v. Francis, 180 Pa. 644, 57 Am. St. Rep. 668, 37 Atl. 120; Whiting v. Nicholl, 46 Ill. 230, 92 Am. Dec. 248; Reedy v. Millizen, 155 Ill. 636, 40 N. E. 1028; Hitz v. Ahlgren, 170 Ill. 60, 48 N. E. 1068; Kennedy v. Modern Woodmen, 243 Ill. 560, 28 L.R.A.(N.S.) 181, 90 N. E. 1084; Iberia Cypress Co. v. Thorgeson, 116 La. 218, 40 So. 682; Seeds v. Grand Lodge, A. O. U. W. 93 Iowa, 175, 61 N. W. 411; Wheelock v. Overshiner, 110 Mo. 113, 19 S. W. 640; Flood v. Growney, 126 Mo. 262, 28 S. W. 860; Chapman v. Kullman, 191 Mo. 237, 89 S. W. 924; Hyde Park v. Canton, 130 Mass. 505; Latham v. Tombs, 32 Tex. Civ. App. 270, 73 S. W. 1060; Hess v. Webb, — Tex. Civ. App. —, 113 S. W. 618; Re Richards, 133 Cal. 524, 65 Pac. 1034; Miller v. Sovereign Camp, W. W. 140 Wis. 505, 28 L.R.A. (N.S.) 178, 133 Am. St. Rep. 1095, 122 N. W. 1126.

Burke, J. About the year 1882 one Margaret J. McGibbney, then unmarried, made homestead entry for a quarter section of land in Grand Forks county, North Dakota, and took up her residence thereon. Shortly thereafter she married one John Wright, by whom she bore two sons, Arthur W., plaintiff herein, and a younger son, whose first name we do not know. Arthur was born in 1884, and the younger son in February, 1887, at which time the mother died. The infant

23 N. D.—13.

child was given away by its father to a mother who had lost her own child, a stranger to him, and so far as we can learn this child has never been heard of since. The husband continued to reside upon his dead wife's homestead, and two years thereafter a patent was issued to the heirs of Margaret J. McGibbney, deceased.

After a short time, Wright placed the son Arthur with the family of the defendants, the Jones, neighbors of his family. Wright was to pay $6 per month in cash and furnish the material for the boy's clothes. While this arrangement was in effect, and in the fall of the year 1890, Wright suddenly disappeared from that neighborhood, leaving many debts. He did not notify the defendants, or anyone, of his intended departure. The defendants continued to care for the boy Arthur, and finally legally adopted him as their own son, about the year 1898.

The elder Wright was soon heard from at Fairhaven, Washington state, where he had gone apparently in quest of a widow who had removed from the Dakota neighborhood to the Pacific coast. Whatever induced his change of residence, he never returned to Dakota, but continued to reside upon the coast. His Dakota creditors took what little property was left by him, excepting his interest in the homestead of his late wife. This land belonging to the father and the two sons in undivided one thirds, under the grant from the government, but not in any manner inherited from Mrs. Wright. However, the said land was soon sold for taxes and a tax deed issued to one Lindwell, a banker in a near-by town. This tax deed caused some talk in the neighborhood, and some of those interested decided to have a guardian appointed for the boy, who would redeem from the tax sale and keep the land for the boy. One Christian was proposed as guardian, but he consulted the Jones before he would consent to act, and shortly thereafter the Jones adopted the boy, and Mrs. Jones obtained a quitclaim deed from Lindwell, for which she paid $126.54, the exact amount due to Lindwell for taxes upon the land. Three years later, when the boy Arthur was seventeen years of age, he ran away and did not return until he had reached his majority and came back to claim the land.

1. The first question arising is the validity of the title which the Jones now assert to the land. They claim under the tax deed to Lindwell, his quitclaim deed to Mrs. Jones, and ten years' adverse pos-

session. We will examine the tax deed first. It is based upon the taxes for the year 1889, and the assessment roll shows that the land was listed as follows:

| Name | Sec. | Twp. | Range | Acres. |
|---|---|---|---|---|
| Margaret J. McGibbney, N. W. ¼ | 35 | 149 | 56 | 160 |

An examination of the sixth line of the Ex. 4 at page 113 of the case of Power v. Bowdle, 3 N. D. 107, 21 L.R.A. 328, 44 Am. St. Rep. 511, 54 N. W. 404, will show that the description in said case is almost exactly like this one, and such case will be controlling here, unless overruled. We are now asked to overrule the earlier case. We are well aware of the severe criticism accorded the Power-Bowdle Case, but we feel that after twenty-one years it would be a mistake to change the rule which has long since become a rule of property in this state. This court has followed the said case too often to repudiate it now. See Iowa & D. Land Co. v. Barnes County, 6 N. D. 601, 72 N. W. 1019; Betts v. Signor, 7 N. D. 399, 75 N. W. 781; State Finance Co. v. Trimble, 16 N. D. 199, 112 N. W. 984; State Finance Co. v. Mulberger, 16 N. D. 214, 125 Am. St. Rep. 650, 112 N. W. 986; State Finance Co. v. Beck, 15 N. D. 374, 109 N. W. 357; Nind v. Myers, 15 N. D. 400, 8 L.R.A.(N.S.) 157, 109 N. W. 335; Beggs v. Paine, 15 N. D. 436, 109 N. W. 322. In the last-mentioned case this court announced that it would not extend the rule, but say "those decisions have established a rule of property in this state from which we cannot now depart." That, being true then, is even more effective now. We must hold the tax deed absolutely void.

2. It therefore follows that neither Lindwell nor his grantee has any interest in the land unless acquired under § 4928, Rev. Code 1005, designated by appellant as the short statute of limitations. This section has been construed by this court several times, J. B. Streeter, Jr. Co. v. Fredrickson, 11 N. D. 300, 91 N. W. 692; Power v. Kitching, 10 N. D. 254, 88 Am. St. Rep. 691, 86 N. W. 737; Stiles v. Granger, 17 N. D. 502, 117 N. W. 777. Under these decisions these defendants, to recover, must show that for the full period of ten years they were in the open, adverse, and undisputed actual possession of the land under color of title, and had paid thereon all taxes

and assessments.   In this order of proof it will be necessary to consider whether the Jones took the land from Lindwell, "openly adverse" to Arthur Wright, and whether for a period of ten years such possession was undisputed by Arthur.   We will preface our answer to the said questions with some of the testimony from the record.   Walter Christian was the neighbor mentioned by the neighbors as a guardian for the boy.

We quote from his testimony:

Q. For what purpose were you to be appointed?

A. Why, it was for Arthur.

Q. And was this question of this land discussed in that connection?

A. Yes, sir.

Q. And what about it?

A. I believe it had been sold for taxes then, and it was to see to the boy and to the property— . . . it was to get the taxes cleared up and keep it clear for the boy.

Q. . . . Just what conversation did you have with the Jones on this subject . . . ?

A. I told them that the neighbors were going to have a guardian appointed and that they wanted me appointed, but I wouldn't accept unless they were willing, and he said if anyone was going to be appointed, he would just as soon have me as anyone else, and Mrs. Jones said the same, and then they called Arthur and he agreed to it.

When Mrs. Jones was on the stand to explain the matter she said: "After a number of years we found that this quarter of land that was his mother's had been sold for taxes. . . . It came into my mind that perhaps I might in some way raise the money *to pay the taxes* on this place, and we could keep it to help support the boy and to pay us back a little bit; . . . so I went to Mr. Lindwell and asked him if he would turn the land over to me, and he did."

Again, she was asked:

Q. Did you ever agree with him (Arthur) to deed the land to him or convey it to him or anything of that kind?

A. I may have said that if he was a good, good boy until he was

twenty-one years and helped us to get along so we would have a home of our own, that we would turn the quarter over to him.

Q. Did you ever say anything to him that you had acquired this title for his benefit?

A. Nothing more than that we might keep him and support him, instead of sending him away.

Again, she says:

Q. Now, did you ever say to him, absolutely or otherwise, that if he was a good boy when he became of age you might give him the land?

A. I presume likely that I did.

And again:

Q. Well, he had given you to understand when he came back after he was of age, that he claimed the land?

A. Yes.

Q. And gave him to understand at that time that you would settle by conveying one-third interest in the land, didn't you?

A. No, sir, not one third.

Again:

Q. In discussing the matter of the Lindwell deed with him, as you say it was discussed when he was a chunk of a boy ten or twelve years old, you didn't disclose any such intention (to keep the land) on your part?

A. No, sir.

Q. And you say it was first disclosed to him by you after he had run away, as you put it?

A. Yes, sir.

Q. When was the first time that you saw him or communicated with him after he ran away?

A. It was in February after he was twenty-one years old.

Q. February, 1906.

A. Yes, sir.

Q. And did you give him to understand at that time that you intended to assert title to it yourself?

A.· I told him at that time when he asked me what I was ·going· to do, that if he had any right to the land his brother had also, and that I should wait two years until his brother was of age before I did anything towards settlement of the land.

Q. Then he was back again in 1908?

A. Yes, sir.

Q. Did you at that time give him to understand in any way that you intended to claim and keep this land?

A. There wasn't very much· said at that time.

Q. What did you mean in March, 1906, when you stated to him in substance that you wouldn't make settlement until the youngest brother came of age . . . ?

A. Why, I considered what little I knew about law, I didn't know much—I knew that in a good many instances the children had to be of age 'before estates could' be settled.

Mrs. Jones also admitted writing a letter to Arthur in October, 1908, wherein' she stated: "No, we haven't done anything yet about the land; I haven't got time,, but must this fall, if possible." There is much more of this kind of testimony, the plaintiff stating positively that Mrs. Jones had made to him the statements partially admitted by her. We are satisfied that the extracts given will satisfy most minds that Mrs. Jones did 'not' assert ·any hostile title as against Arthur until after he had run away, if she ever so asserted it. In fact it seems clearly established that this good woman, either through love of the boy or through pride toward her neighbors, had assumed a voluntary trust towards this boy and advanced the money from her meager means ·to keep the land for him. After he had so ungratefully run away, she may have decided to keep the land herself, and she probably has maintained an adverse claim against the elder Wright and the younger son, but as against the one-third interest of Arthur, we cannot see that she has established any such claim. While she was under no obligation to assume such trust, nevertheless, having so assumed it, she must account to her trustee. Rev. Codes 1905, chap. 60; 26 Am. & Eng. Enc. Law, 959; 21 Cyc. 101, and cases cited. It is our conclusion, then, that as against this plaintiff's one-third interest in the land, defendants have

no right, title, or interest, and the trial court was right in quieting such interest in plaintiff.

3. We have next to consider the claim of plaintiff to the other two-thirds interest in the land. As already stated he did not inherit the one third from his mother. The government gave him such interest direct. At the same time the father was given one-third interest therein, as also was the brother. If the brother is dead his interest would go to the father. If the father is dead his share should go to Arthur. If the father is not dead, Arthur can in no way inherit any of the land. The estate of the father has not been probated, but the plaintiff relies upon the presumption of death by unexplained absence, under § 7302, Rev. Code, 1905. We have therefore to determine whether the evidence offered is sufficient to raise the presumption of death of the father. Again we will have to quote from the evidence offered at the trial. Plaintiff himself testifies that he heard that his father was out west at Fairhaven, Washington, and that he never wrote to him even one letter. Mrs. Jones testified that he had gone to the Pacific coast. Most of the neighbors testified to the same effect.

Mrs. Thomas, a neighbor, stated,

Q. Now to get this thing straight,—he left here in 1890?

A. Yes, sir.

Q. And you know now that he went to where your sister was, at Fairhaven?

A. Yes, sir.

Q. In 1892 your sister came back and said he was out there?

A. Very likely she did.

Q. Then a couple of years after that, in 1893 or 1894, you wrote out and she replied that he had gone temporarily to some island to cut wood?

A. Yes, sir.

Q. Then some time after that, between 1893 and 1898, you wrote out and ascertained that he either was going or had gone to the Klondike?

A. No, sir, I never wrote but the one letter.

Q. But from some other letters that came to your brother's wife you learned that he had gone to the Klondike?

A. I think I learned that from Mrs. Jones.

Q. When was it that Mrs. Jones told you that Wright had gone to the Klondike?

A. It seems to me it was along about the time of the adoption.

It seems to be abundantly proven, then, that John Wright about the year 1890 removed from North Dakota and took up his residence upon the Pacific coast at or near Fairhaven, Washington, and that his home was no longer in Dakota, but in Washington; and to raise a presumption of death it must be shown that he has been absent and unheard of from that country for the full period of seven years, and not merely so absent from his Dakota home. See the case of Burnett v. Costello, 15 S. D. 89, 87 N. W. 575, where § 7302 of our Code was under consideration. The presumption is founded upon human experience and reason. A man disappears from his home, family, and friends. For seven years he does not write to those nearest and dearest to him. Those most interested in him are unable to locate him. The law in its wisdom says, surely the man is dead. On the other hand, after his disappearance it is shown that he has located in a new country and intended to desert his family. The presumption is immediately overcome. To create a new presumption of death it must appear that he has disappeared from his new and last home. Davie v. Briggs, 97 U. S. 628, 24 L. ed. 1086; Miller v. Sovereign Camp, W. O. W. 140 Wis. 505, 28 L.R.A.(N.S.) 178, 133 Am. St. Rep. 1095, 122 N. W. 1126, where the cases are collected.

The testimony at the trial below was principally to show that John Wright had disappeared from Dakota. The attorneys for the plaintiff wrote about a dozen letters to people upon the coast, but with no result. One answer they received says: "There is a lady by the name of Julia Brown, who, I am sure, knows the whereabouts of Mr. Jack Wright. Her postoffice address is Seattle, Washington, 2105 Sixth Ave. East, Flat A., also her ex-husband, George Brown of Olalla, Washington, possibly knows his whereabouts."

Mr. Shirley, attorney for plaintiff, testified upon cross-examination:

Q. There has been nothing done excepting what has been detailed?

A. I think not.

Q. Been no directories consulted in that country, Fairhaven, Seattle, and Bellingham?

A. No, sir.

Q. No chief of police or sheriff written to?

A. Not that I know of.

Q. No postmasters?

A. Not by me.

Q. Nobody been sent to see Mrs. Dyer to ascertain whether she would say more than she wrote?

A. No.

Q. You have relied entirely on this correspondence?

A. Yes, sir.

Q. Did you insert any advertisement in the newspapers in Fairhaven, Seattle, or Bellingham?

A. No place in that country.

Q. The four or five letters that have been written by Mr. Rex and the two or three or four written by you is the full amount of inquiry made to elicit the whereabouts of Mr. Wright?

A. I presume so.

When we consider that Mrs. Dyer wrote in 1909, just before this suit was brought, that she was sure that Mrs. Brown knew of Wright's whereabouts, and that Wright was a sober, healthy, cautious man when last seen we agree fully with the trial court that no presumption can arise upon the evidence that he is now dead. We therefore hold that plaintiff has no interest in the remaining two thirds of the land.

4. Nothing now remains to be determined excepting the accounting between the plaintiff and defendant. The evidence thereupon is long and of importance to this suit alone. We will therefore not set it forth, but will content ourselves with saying that, upon a careful examination of the evidence and computations resulting, we are of the opinion that the findings of the trial court in this particular are also correct, and the judgment is in all things affirmed.