COMPANY A, FIRST REGIMENT NATIONAL GUARD TRAINING SCHOOL, a Corporation, Appellant, v. STATE OF NORTH DAKOTA, et al., C. B. Little, Edmond A. Hughes, and Mary H. Hughes, Respondents.

(224 N. W. 661.)

Opinion filed February 21, 1929. Rehearing denied April 17, 1929.

*F. O. Hellstrom,* and *Knauf & Knauf,* for appellant.

*Zuger & Tillotson,* for respondents.

ENGLERT, Dist. J.   This is an action to quiet title to lots 23 and 24 of the original townsite of Bismarck, Burleigh county, North Dakota. The case was before this court on a former appeal.   Company A. First Regiment N. D. Nat. Guard Training School v. State, 55 N. D. 897, 54 A.L.R. 949, 215 N. W. 476.   It was sent back for a new trial, for reasons therein mentioned, without a consideration of the merits involved.   Since the facts are quite fully stated therein, we will give only such facts here as will enable an understanding of the merits of the case.

The plaintiff is a corporation.   It was organized and incorporated on April 30, 1906, under § 1788 of 1905 Revised Codes.   The object of the

corporation was to lease or buy suitable grounds on which to erect an armory, own and maintain a rifle range, to be used by the company as a training school, and place of meeting to promote and instruct its members in the arts and science of war. It is designated in the Articles of Incorporation as "Company A, First Regiment North Dakota National Guard Training School." A board, consisting of five members, managed and controlled the affairs of the corporation. It provided that the captain of the company should be ex-officio one of the five members, and president of the board of directors.

In 1908, Company A negotiated for the purchase of said lots. The money with which the property was purchased was raised through public entertainments, dances, contributions, loans, and the city council donating from the public funds of the city of Bismarck. The lots were purchased by the company, and the title was taken in and deeded to the state of North Dakota. The deed to the state of North Dakota was dated March 18, 1908 and recorded in Burleigh county on March 23, 1908.

On May 27, 1908, the then governor of the state of North Dakota conveyed the lots to Company A, First Regiment, North Dakota National Guard Training School, a corporation, as distinguished from the militia company (Co. A), by warranty deed, which deed was recorded in Burleigh county on June 5, 1908.

On April 30, 1914, Company A, the training school corporation, gave a mortgage on said lots to the Red River Valley Mortgage Company to secure the sum of $3,500 due May 1, 1919. It also gave a mortgage on this property to that company on the same day to secure the sum of $262.50.

On May 6, 1914, the company gave a mortgage to the state of North Dakota on said lots to secure the sum of $5,000. Each of said lots is 25 feet wide and 140 feet long. In 1908, an armory was erected thereon, 50 feet wide and 90 feet long. It was a brick structure and cost $11,000. It is spoken of as a two-story building, made up of full basement, with wooden floor and one story above the basement twenty feet high.

The armory was used by the militia company for training its members and for entertainments until March, 1917, when the company was called into Federal service. From March to October 1, 1917, Company

I occupied the armory, when this company was also called by the Federal government into military service. Up to March, 1917, when Company A was called, one A. B. Welch was captain of that company. In due time he organized Company I and became its captain. Captain John W. Murphy was assigned to and made captain of Company A. Both companies were transported overseas as a part of the United States army.

On leaving, Captain John W. Murphy appointed the defendant Edmond A. Hughes, on September 29, 1917, custodian of the armory to take effect October 1, 1917. He accepted that trust and managed the property until Captain John W. Murphy returned some time in 1918, the exact time not appearing. Captain John W. Murphy returned some time in advance of Company A. The members of Company A returned later, not together, but in various numbers and at different times. Meanwhile, Captain John W. Murphy died.

On October 9, 1919, H. T. Murphy and L. W. Sperry deeded said property to Edmond A. Hughes and C. B. Little. They signed as president and secretary of Company A, the training school corporation, respectively. The consideration mentioned in the deed is one dollar and other valuable consideration. By this time all of the members of Company A had returned from foreign service. The company was never mustered out but it was not, however, reorganized until May 22, 1922.

On January 23, 1920, Edmond A. Hughes and C. B. Little began an action against the state of North Dakota to quiet title to said lots. Judgment was entered by default on April 22, 1920. They took possession of the said property on April 23, 1920, or thereabouts, and began making extensive improvements. On April 23, 1920, Edmond A. Hughes conveyed his interest in said property to Mary H. Hughes.

On August 4, 1921, the plaintiff brought this action to quiet title. The complaint is in the statutory form. It alleges fee ownership of the premises in the plaintiff and prays that the defendants be decreed to have no estate or interest in the said property and that the title thereto be quieted in plaintiff.

The state answered, admitting plaintiff to be the owner in fee of the lots described, and asserted its five thousand dollar mortgage and prayed that the lien thereof be preserved. The defendants, Edmond A. Hughes,

C. B. Little and Mary H. Hughes, answered and counterclaimed, basing their title on various grounds therein set forth, which may be epitomized as follows:

(1) That Company A deeded the property to Edmond A. Hughes and C. B. Little, on October 9, 1919, for a valuable consideration.

(2) That a judgment was entered in favor of these defendants and against the state of North Dakota, on April 22, 1920, quieting title in them.

(3) That the purchase price paid by these defendants to the plaintiff has not been repaid, and that it has not offered to repay the same.

(4) That the plaintiff stood by and permitted extensive improvements to be made upon the premises, and thereby acquiesced in and ratified the said sale of October 9, 1919, and that the plaintiff is now estopped from claiming any interest in the said property.

The plaintiff replied, denying the matters set forth in the answer and counterclaim. The other defendants make no claim to the property and will not, therefore, be further mentioned.

Evidence was received touching and bearing upon the various issues thus presented. Other essential facts, not heretofore stated, so far as necessary, will be mentioned in connection with the particular points to be decided. The trial court made findings of fact, conclusions of law, and ordered judgment quieting title to said property in C. B. Little and Mary H. Hughes. Judgment was entered accordingly. From this judgment, the plaintiff appeals and demands a trial de novo.

The first proposition presented for consideration is the deed dated October 9, 1919. It is signed: "Company 'A' First Regiment, North Dakota National Guard Training School By H. T. Murphy, . . . President Attest L. W. Sperry, . . . Secretary."

H. T. Murphy had been captain of Company A and ex-officio president of the board of directors, under and by virtue of the articles of incorporation, from 1907 to June, 1913, when he resigned. During the World War, he was commissioned a captain in the Second Regiment. He remained a member of Company A, but was not an officer or director of the company after his resignation. On October 9, 1919, H. T. Murphy, L. W. Sperry and L. H. Carufel held a meeting in Carufel's house, organized and elected themselves officers, and authorized a sale of the

.property. Murphy testified: Q. Now, then, Mr. Murphy, were they the only ones notified of that meeting? A. Yes.

The articles of incorporation provide for the election of officers at the annual meeting. The annual meeting was required, by the articles, to be held on the last Monday of April of each year at the armory or the usual meeting place of the company. It requires no argument to demonstrate that there was no authority for the meeting place, election and authority conferred by the three members mentioned. They were not officers of the company. They had no authority to convey the property of the company. The whole transaction, including the deed itself, was wholly beyond their power and scope of authority. The deed is, therefore, clearly void.

The charter of a corporation furnishes the measure of authority of the corporate officers and warns third persons dealing with the officers against acts beyond the scope of their authority. Kelly Weber & Co. v. Vordenbaumen Lumber Co. 133 La. 290, 62 So. 910; Bloomingdale v. Cushman, 134 Minn. 445, 159 N. W. 1078.

The deed conveyed no title to the property for another very cogent reason. At the time of the purported transfer from Murphy and Sperry to Hughes and Little, title to the lots was in the state of North Dakota. This particular feature will be considered a little more at length in connection with the next point here involved.

To remedy the last-mentioned defect in the title, Edmond A. Hughes and C. B. Little began an action against the state of North Dakota, on January 23, 1920, to quiet title. As appears from the facts stated, the property in controversy was deeded to the state of North Dakota in 1908. The object of deeding the said property to the state was to enable Company A to take advantage of § 2, of Chapter 174, Laws of 1907, and receive an appropriation of five thousand dollars. Taking advantage of this section would have entailed submission to the supervisory control of the state board of armory supervisors and would have deprived the corporation of any proprietary interest in the property upon dissolution. Laws 1907, § 4, chap. 174.

But the attempt to comply with § 2 was evidently abandoned, for on May 27, 1908, the governor gave a deed for said lots to the training school corporation. That transfer was made to enable Company A, the militia company, to take advantage of the provisions of Section 5,

of Chapter 174, Laws of 1907, which, in substance, provided that when such company owns a site with an armory building thereon, valued at ten thousand dollars, exclusive of the value of the land, and the building is approved by the board of armory supervisors, the company could borrow five thousand dollars from the state (the appropriation provided for in § 2) by giving a mortgage on its property to the state. But there was no authority, in any event, for transferring the property by the governor alone, nor did any such authority exist under the statute generally. The defendants concede "that there was no express authority by law for conveyance by the state of such title to said Company 'A.'"

At the time of that action, then, the title to said lots was still in the state of North Dakota. In that action, service was made on the state of North Dakota in the following manner: "Service of the summons and complaint in the above entitled action is hereby admitted by copy thereof received at Bismarck, North Dakota, this 13th day of March, 1920. Albert E. Sheets, Jr."

Section 8175, Compiled Laws of 1913, provides for actions against the state to quiet title. Subdivision 3 of § 7426, Compiled Laws of 1913, requires service to be made when the state is the defendant upon the governor or attorney general. At the time that action was brought, William Langer was attorney general of this state. Under the law, it is the duty of the attorney general to appear and defend all actions against the state. The record does not disclose any service on the attorney general or the governor. In that action, judgment was secured by default and title quieted in Edmond A. Hughes and C. B. Little. Judgment was entered on April 22, 1920. That judgment is relied on by these defendants as giving title to them. The court had no jurisdiction of the defendant, state of North Dakota, in that case, and the judgment entered therein is of no force and effect. Hence, the legal title is still in the state.

It may be suggested that, inasmuch as an answer was filed in this case on behalf of the state admitting the plaintiff to be the owner in fee of the lots described and asserting its interest as a mortgagee under the $5,000 mortgage, the answer should be taken as conclusive against the state. But the validity of this contention cannot be granted for the reason that it is not the office of the statutory action to determine adverse claims to effect conveyances of real property. Its purpose is to afford

a convenient mode of determining all conflicting claims to real property. This is not to say that conveyances may not be ordered as a practicable means of adjusting equities. In such an action a plaintiff cannot succeed on the weakness of the title of an adversary and, consistent with this principle, a defendant cannot by an admission in the answer confer any rights upon the plaintiff, particularly as against other parties in interest not joined, where the evidence does not show the rights to be as alleged.

In determining the rights of the parties to this litigation, it is necessary to refer more specifically to some of the facts in order that legal conclusions may be drawn therefrom with respect to the property rights. The corporation which was formed in 1906, under § 1788, Revised Codes of 1905, and which for brevity we will term the training school corporation, was authorized to be formed by not less than three persons who could be either members or ex-members of regularly enrolled national guard companies and the corporation was given charter power to obtain and maintain a building to be used by the company, of which the incorporators were either members or ex-members, as a military training school, armory and place of meeting. The corporation was subject to the duties and liabilities of other corporations except as otherwise provided. It was authorized to lease or buy real estate upon which to erect a military training school, armory or drill hall, or to purchase or lease a rifle range, and the property so purchased and used was exempted from taxation. It may be assumed that the negotiations resulting in the original purchase of the property in question were conducted by the training school corporation, which is the plaintiff in this action, and that it caused the title to be transferred from the former owner to the State of North Dakota. What was the effect of this and the subsequent transactions under chapter 174, Laws of 1907? This chapter contains no reference whatsoever to training school corporations such as might have been organized under § 1788, Revised Codes of 1905. It is an act to aid the national guard. The first section creates a board of armory supervisors consisting of the governor, the adjutant general and the colonel commanding the regiment. The second section appropriates the sum of $5,000 to every company, battery or regimental band of the national guard which shall have deposited with the state $2,00.) as an evidence of good faith and which shall have conveyed to the state

the title to a site for an armory approved by the board of armory supervisors or which shall have conveyed to the State an armory site with armory buildings thereon of the value of not less than $7,000 approved by the board of armory supervisors. These appropriations were spread through a period of five years, the board of armory supervisors being authorized to determine the order in which the various organizations, limited to thirteen, should receive such aid. Section 3 authorizes the state treasurer to expend the appropriation and deposit on approval of the board of armory supervisors and the state board of auditors. Section 4 provides that whenever any such military organization, which shall have availed itself of the provisions of the act and which has received the appropriation provided, shall be mustered out of service and it shall appear that there is no probability of a new company, battery or regimental band being organized in the city or town where the armory is located, the board of armory supervisors shall have the authority and power to transfer the property to the municipality in which the same is located for public purposes upon the repayment to the state of the appropriation without interest. Section 5 provides that when any company, battery or regimental band shall own any site with armory buildings of the value of $10,000, exclusive of the value of the land, which shall have been approved by the board of armory supervisors as sufficient and desirable for armory purposes, such organization may with the approval of the board of armory supervisors obtain the benefits of the appropriation by executing to the state a mortgage on the property for the sum of $5,000, payable on demand; and it is further provided that during the life of the mortgage the building and site shall be under the control and supervision of such company, battery or regimental band. It would seem to be obvious from this survey of the provisions of this statute that it was not intended for the benefit of any training school corporation, nor was it made available through them. Its provisions are limited solely to the military organizations described. There is a vast difference—particularly from a governmental standpoint—between a live military organization which is part of the militia of the state and a group of ex-members of military organizations who may be qualified to form a training school corporation under the provisions of § 1788, Revised Codes of 1905, or the corporation itself. This is so obvious as not to require elaboration. We cannot

say that the legislature did not have such distinction in mind when it passed chapter 174, Laws of 1907, for the benefit of the military organizations alone.

Of what significance is this distinction in determining the rights of the parties to this litigation? It has been previously shown in this opinion that after the passage of the act to aid the national guard the legal title was caused to be placed in the name of the State of North Dakota, doubtless as a step taken in anticipation of full compliance with § 2 of the act. It has also been shown that this title has never been effectively devested, although it appears that a deed, signed by the governor and running to the training school corporation, was executed and delivered; and it further appears that thereafter a mortgage by the training school corporation was executed to the state covering this $5,000 appropriation and that two mortgages were likewise executed by the same corporation to the Red River Valley Mortgage Company. It also appears that the military organization known as Company A has never been mustered out of the service of the state. Regardless of the form of the security upon which this $5,000 appropriation was advanced as a loan, there can be no question but that the money obtained was that which was appropriated by chapter 174, supra. Neither can there be any doubt but that those who participated in the transaction are legally precluded from asserting that they are not bound by the conditions to be met by those obtaining the benefit of the appropriation. Hence, regardless of the name attached to the mortgage, to obtain the money under § 5 of the act, the money was advanced for the benefit of the *military* organization and not for the benefit of the training school corporation, and when the corporation executed the mortgage it must be deemed to have done so as a pledge of the property of the military organization; since it was only to aid such organization owning such property that the appropriation was made. Hence, after this transaction and so long as the mortgage should remain a live mortgage to the state, the training school corporation and its members are estopped as against the state to assert any proprietary interest in the property. It or they no longer had power to control or supervise such property, as the control and supervision under the law is expressly placed in the military organization. It follows from this that all transactions subsequently had with the training school corporation, its officers or members,

during the life of the mortgage to the state, had no effect upon the rights of the military organization, for which during this whole period the state has virtually held the legal title to the property in trust. This company is not a party to this proceeding. It follows further that the training school corporation has no interest in the property in question nor in this controversy and the action is therefore dismissed as to it.

Our holding that plaintiff has failed to show any right or title in itself does not, however, necessarily dismiss this action. The answer interposed by defendants C. B. Little, Edmond A. Hughes, and Mary H. Hughes asserts title in them and asks affirmative judgment supporting their claims. They denominate it a counterclaim and it is a counterclaim in this action. See Power v. Bowdle, 3 N. D. 107, 21 L.R.A. 328, 44 Am. St. Rep. 511, 54 N. W. 404; Betts v. Signor, 7 N. D. 399, 75 N. W. 781; Sanders v. Riverside, 55 C. C. A. 240, 118 Fed. 720.

Under the provisions of § 8153, Compiled Laws of 1913, the defendants thus become plaintiffs under this counterclaim and the plaintiff and co-defendants are deemed defendants as to them and "the court in its decision shall find the nature and extent of the claim asserted by the various parties, and determine the validity, superiority and priority of the same." Hence, it is the duty of this court to determine and adjudicate the claims set forth in defendants' answer, even though plaintiff's cause of action fail. Spencer v. Beiseker, 15 N. D. 140, 107 N. W. 189. This principle has support in other jurisdictions. In Goodrum v. Ayers, 56 Ark. 93, 19 S. W. 97, the court says: "Though the plaintiff, in an action to quiet title, was not in possession and could not for that reason maintain the action yet where the defendant filed a cross bill to quiet his own title, this gave the court jurisdiction of the whole controversy." See also Reichelt v. Perry, 15 S. D. 601, 91 N. W. 459; Sanders v. Riverside, 55 C. C. A. 240, 118 Fed. 720; Cockrell v. Warner, 14 Ark. 346; Davenport v. Wolf, 59 Okla. 92, 158 Pac. 382; Siedschlag v. Griffin, 132 Wis. 106, 112 N. W. 18.

The rights of the state, either in itself or as the holder of the legal title for another, are in conflict with the claims of these answering defendants as set forth in their counterclaim. The ultimate disposition of this controversy as between these defendants will require the presence of the militia company and the board of armory supervisors. It is ap-

propriate here to comment on the facts appearing in this record for their bearing upon the equitable status of the parties.

In this case, the deed recites a consideration of one dollar and other valuable consideration. The answer states that Edmond A. Hughes and C. B. Little paid fifteen thousand dollars for the property. It would, however, be difficult to say, on the evidence in this case, just what was paid. Edmond A. Hughes testified that they paid "something over seventeen thousand dollars." C. B. Little was unable to state the exact amount, but said that they paid the entire purchase price. H. T. Murphy, testifying for respondents, gave the amounts paid by the purchasers as follows:

Two mortgages to Red River Valley Mortgage Company, . . $6600.00
Mortgage to the State of North Dakota, . . . . . . . . . . . . . . . . 5000.00
To creditors of Company A, $3800.00 or . . . . . . . . . . . . . . . 3900.00
Paid to Grand Army of the Republic, . . . . . . . . . . . . . . . . . 300.00

Making a total of . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $15,800.00

It also appears, from the evidence, that while the mortgages to the Red River Valley Mortgage Company were paid, they were not satisfied. Mr. Hughes secured assignments thereof from the Red River Valley Mortgage Company to the First National Bank of Bismarck. These mortgages bear 12 per cent interest after maturity, but in any accounting between the parties hereto no more than six per cent should be allowed from the time of the assignment.

The mortgage to the state of North Dakota has not been paid. Mr. Hughes testified that five thousand dollars had been deposited in the First National Bank by Hughes and Little, to take care of this mortgage, subject to the condition that title be quieted in them against the state. But that amount is still on deposit in that bank and no interest should be allowed to either party. So those three mortgages are still unpaid and liens of record against the property.

The evidence further shows that Hughes and Little have collected the rents and profits from the armory building, but the status of that account does not clearly appear. It appears, however, that when the defendants went into possession of the property many alterations were required to make it suitable for occupancy for business purposes and

that this expense was borne by a tenant and the amount credited on the rent. Hence, only the net rental above this was received by these defendants.

It ought also to be mentioned that whatever amounts were paid by the purchasers were not paid to the training school corporation or to the militia company but to H. T. Murphy. The record shows that from the beginning of the enterprise he was the one most active in the business affairs and most familiar with the obligations incurred. While he had no authority to dispose of the company's property, there is no reason to believe that he did not apply such money as he received on its indebtedness and the militia company has enjoyed the benefits of whatever facilities were supplied. The nature and character of this whole controversy is such that the militia company cannot, in justice, on the evidence in this case, be precluded from repudiating the transaction as unauthorized; but as it comes into equity it should be required to do equity and this may well require an adjustment on account of the moneys expended on its account. The case is one, therefore, that requires an accounting, unless the company is estopped.

This brings us to the question of estoppel. The party beneficially interested hereafter will be the militia organization. It is instituted very largely for purposes of state and national defense. The members thereof are the citizen soldiers and are among the first to be called in case of invasion, insurrection, riots, or whenever the public safety requires. It is not engaged in a gainful occupation, or for profit. For that reason, its members are not so keenly on the lookout to guard and protect their interests and the property rights possessed by the company. It is common knowledge, and such is the testimony here, that on returning from overseas the soldiers, everywhere, were much disorganized. According to the evidence of Captain Brocopp, the members of Company A, on returning from Europe, were tired of war and did not go near the armory. It appears that some of the members knew of changes being made in the armory and that a new building was being erected on the rear of the lots, but they excuse their failure to act by saying that they had been informed that the property had been transferred on mortgage foreclosure. It was during this period of inactivity that the negotiations of Edmond A. Hughes and C. B. Little materialized and the property was deeded to them. But it seems that they were informed that

Company A did not have title to the premises before October 9, 1919, and that they did not rely on the deed from said company. The deed was accepted only on condition that good title could be obtained by an action against the state of North Dakota. The deed was executed on October 9, 1919, by Murphy and Sperry, and Edmond A. Hughes and C. B. Little instituted their action in January and placed the deed on record April 16, 1920, going into possession on April 23, 1920, when the decree of the district court of Burleigh county had been entered quieting title in them and against the state. Company A was not made a party to that action.

Where one purchases real property from a corporation and is informed prior to the transaction that the title to the property sought to be purchased is in another, it is sufficient notice to warn him against transacting business with or dealing for property of the corporation. Hence, Hughes and Little can hardly be said to have relied implicitly and justifiably on representations by the militia company that those dealing for them were regularly authorized. But this does not imply that their good faith is impugned.

In North Louisiana Baptist Asso. v. Milliken, 110 La. 1002, 35 So. 264, the court held, where one purchasing property of an association is informed by counsel, some time prior to the transaction, that he had been retained by a number of the members of the association to protest against the sale of such property, on the ground that the executive board making it was not authorized so to do, it is sufficient to warn him against attempting to transact business with such executive board.

After the decree of April 22, 1920, was entered, or soon thereafter, Edmond A. Hughes and C. B. Little began improving the armory building to the extent of about seven thousand five hundred dollars, which amount was paid by the tenant, as heretofore indicated. Later they erected a building on the rear of the lots and made it "into three small store rooms," at a cost of "something over eleven thousand dollars" as I remember.

It is true that the law, equity and good morals exact good faith from Company A in its dealings with others. But whoever invokes the rule of estoppel must not only have acted in good faith, but he must have relied on the acts, representations, and conduct of those against whom he so pleads. Where the rule of equitable estoppel is invoked

·it rests upon right and fair dealing. Its remedies are not penal. Its mission is to protect the innocent and blameless. Westbrook v. Guderian, 3 Tex. Civ. App. 406, 22 S. W. 59.

The rule laid down by Pomeroy, in 2 Pomeroy's Equity Jurisprudence, 4th ed. § 804, is strongly relied on by respondents. It is there said:

"Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract, or of remedy."

The rule there announced is sound without question. But here respondents relied upon the action to quiet title and decree entered therein. Even after securing the decree quieting title, respondents· did not have title. As stated, the decree was void. It was on the strength of that decree that respondents made the improvements. The title still remained in the state. Respondents were in no better position, after the decree, so far as the deed from Company A was concerned, than before.

While the defendants were mistaken in believing that title to the property could be acquired through the negotiations had, the record does not show that they were actuated by improper motives nor that they acted in bad faith or in disregard of the substantial rights of the interested parties. When the negotiations had reached the point that they assumed would give them a standing to bring an action to quiet title, such an action was promptly brought and prosecuted to a conclusion but not to a successful one on account of the defective service. The attitude of the state in this controversy up to date further reflects the good faith of the defendants, since the state has not actively intervened to prevent the consummation of the original transaction. Furthermore, two trial judges have found that the defendants have paid all that the property was worth at the time of the transaction. Hence, we are of the opinion that they may be properly regarded as being in a court of equity with clean hands and their rights should be dealt with and protected according to equitable principles.

In short, we are of the opinion that the legal title is in the state of North Dakota in trust for the militia company; that the state of North Dakota has a first lien on the property for the sum of $5,000; that the defendants, Hughes and Little, have an equitable lien for the amount of money which they have expended in taking up prior liens and disbursements made in behalf of the company, and the amounts expended by them in improvements placed thereon; and that they in turn are obligated to account for the rents and profits received by them during the time of their occupancy.

It follows that the judgment of the district court must be reversed with directions to the court to require the additional parties to be brought in and to direct an appropriate amendment to the answer of the state to be made, and thereafter to ascertain an account between the additional parties and Mary H. Hughes and C. B. Little, and to render such judgment, consistent with this opinion, as may be deemed equitable considering the nature and condition of the property including its adaptability for its original purposes. No costs to any party.

BIRDZELL, CHRISTIANSON, and BURR, JJ., and KNEESHAW, Dist. J., concur.

MR. CHIEF JUSTICE BURKE and MR. JUSTICE NUESSLE, disqualified, did not participate; HONORABLE M. J. ENGLERT, Judge of First, and HONORABLE W. J. KNEESHAW, Judge of Second Judicial District, sitting in their stead.